785 A.2d 59 (2001)
345 N.J. Super. 349
STATE of New Jersey, Plaintiff-Respondent,
v.
Reginald CLARK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 2001.
Decided November 28, 2001.
*60 Kevin G. Byrnes, Designated Counsel, argued the cause for appellant (Peter A. Garcia, Acting Public Defender, attorney; Mr. Byrnes, of counsel and on the brief).
Jordana Jakubovic, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Jr., Attorney General, attorney; Ms. Jakubovic, of counsel and on the brief).
Before Judges STERN, LINTNER and PARKER.
The opinion of the court was delivered by STERN, P.J.A.D.
We hold that, under the totality of circumstances presented by this case as hereinafter detailed, defendant may pursue his claim of "racial profiling" on a petition for post-conviction relief ("PCR"). Accordingly, we remand to the judge designated by the Supreme Court to consider applications regarding discovery in "racial profiling" cases involving the New Jersey State Police, to consider the defendant's request for discovery to support his claim.

I.
Following denial of his motion to suppress, defendant was convicted of possession of a controlled dangerous substance, contrary to N.J.S.A. 2C:35-10a(1) (count one) and possession of a controlled dangerous substance with intent to distribute, contrary to N.J.S.A. 2C:35-5a(1) and -5b(1). The motion challenged the "consent" search.
At sentencing, on December 20, 1996, count one was merged into count two and defendant was sentenced to the custody of the Commissioner of Corrections for twenty years with six years and eight months to be served before parole eligibility. Judgment was entered that day or shortly thereafter. R. 3:1-4; R. 3:21-5.
Defendant appealed from the judgment, and we affirmed the conviction. However, we remanded for resentencing, resulting in an eighteen-year sentence with a six-year parole ineligibility term.
A petition for post-conviction relief was filed on November 10, 1997, less than five years after the conviction. See R. 3:22-12. It alleged (1) ineffectiveness of trial counsel for "refus[ing] to investigate" the case; (2) prosecutorial misconduct, and (3) that an excessive sentence was imposed.[1] Other contentions, including a claim of "racial profiling" and a challenge to the stop, were also raised at the PCR hearing.
The PCR judge denied the petition on January 6, 2000,[2] stating in part:
With regard to the racial profiling issue, I'm going to deny that also without prejudice because I think that all these issues are going to take place in front of one judge. It just makes sense and there's nothing again here that would satisfy the second prong of Strickland.

*61 Furthermore, even if the State of New Jersey now admits that racial profiling was going on at this time, I mean at the time of the report there is a record. I don't know whether that type of decision would be retroactive. I have to take some type of guidance from the case law that's out there and if you look at generally speaking, judicial decisions that are made to curb bad police conduct, those decisions are not normally retroactive if it doesn't go to the truth seeking process.
In other words, even though it may have been racial profiling, there's certainly nothing wrong with the four and a half pounds of cocaine found in the car. It doesn't go to that. The truth of the matter is that there were four and a half pounds of cocaine in the car.

II.
The testimony at the motion to suppress reveals that on October 9, 1995, New Jersey State Police Officer Kevin Goldberg was patrolling the New Jersey Turnpike in Cranbury Township, between Exit 7A and Exit 9. At approximately 4:52 p.m., Goldberg, who was parked along the turnpike operating a "radar unit," observed "a green Dodge traveling in the center lane at a high rate of speed." After the radar indicated that the automobile was traveling 69 miles per hour in a 55 mile per hour speed zone, Goldberg left his "hiding spot, entered the roadway" and then "activate[d his] overhead lights" and "pull[ed the vehicle] over to the side of the road."
Upon stopping the car, the trooper approached the passenger side of the vehicle and observed three occupants. Defendant was driving the automobile, Jeanetta White was the front seat passenger and her husband, Sean White, was seated in the right rear.
Goldberg initiated conversation with defendant, asking him for "the documents to the vehicle and his license." Defendant informed the officer "that he did not have a driver's license" but "produced a photocopy of a ... Pennsylvania registration." Defendant also advised Trooper Goldberg that the car was a "rental vehicle, but that he did not know who had rented the vehicle," and that "he had no identification on him to prove that he was Reginald Clark."
Based on his failure to produce the requisite documents, and his "heightened nervous demeanor," Goldberg asked defendant to exit the car and "step to the rear of the Dodge." The trooper then engaged defendant in conversation, at which time defendant explained that he "had the cruise control [set] on 65." In addition, defendant mentioned that he had driven the Whites from Delaware to a hospital in Brooklyn, New York, in order to visit Mr. White's mother, who was dying of AIDS.
Goldberg proceeded to speak with the other occupants of the automobile. First, the officer spoke with Mrs. White, who informed him that she did not know who had rented the car. She did, however, tell Goldberg that they had driven "to New York to visit her mother-in-law ... [who] was dying of AIDS." On the other hand, her story conflicted with defendant's in that she stated that they had visited her mother-in-law "at her house," rather than at a hospital.[3]
Next, Trooper Goldberg spoke with Mr. White, who advised that "they went up to the hospital to visit his mother." Based on the conflicting stories, the trooper *62 asked "Mr. Clark to step back to the troop car," as he "wanted to search the vehicle." In addition, a second trooper arrived on the scene and stood with Mr. and Mrs. White "in front of the Dodge."
Goldberg then asked defendant to take a seat in the "right rear" seat of the State Police vehicle. At that time, the trooper "completed and presented a ... State Police consent to search form." Goldberg read the form to defendant and informed him that "he had the right to refuse the consent." In addition, Goldberg noted that defendant appeared to be "reading along" as the consent form was read to him, and that there were no communication problems between the officer and him.
Defendant signed the consent form,[4] at which time Goldberg asked him to "go to the front of the Dodge with Mr. and Mrs. White" and the second trooper. Goldberg then began to search the "passenger compartment" of the vehicle, and after finding nothing, searched the "trunk compartment." In the trunk, the trooper observed "[s]hopping bags and a blue and white knapsack."
The shopping bags contained only clothes and shoes. Upon opening the knapsack, Goldberg observed a "brown paper bag" at the top. The trooper then opened the paper bag and found inside "[a] clear plastic bag containing a large amount of crack cocaine." The knapsack also contained a "female sanitary napkin" and a newspaper. Based on his discovery, Goldberg read the individuals their rights and "then placed them under arrest."
The trial judge denied the motion to suppress because all three passengers said "they had no luggage in the car" and "no one claimed ownership of the blue bag." The judge concluded that, if defendant "is claiming [the bag] is not his, then he has no reasonable expectation of privacy that was invaded ... But if it is Mr. Clark's blue bag, he gave consent. If it is not, then the person with the right to object would seem to be one of the Whites."[5]

III.
A petition for post-conviction relief "is cognizable if based upon ... [a] substantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey." R. 3:22-2(a). There is no dispute that "racial profiling" violates due process and equal protection rights when a defendant's car is stopped, and others are not, merely because the driver or passenger is a minority. See United States v. Armstrong, 517 U.S. 456, 463-66, 116 S.Ct. 1480, 1486-87, 134 L.Ed.2d 687, 688-89 (1996); State v. Ballard, 331 N.J.Super. 529, 539-40, 752 A.2d 735 (App.Div.2000); State v. Smith, 306 N.J.Super. 370, 376-78, 703 A.2d 954 (App.Div.1997). However, R. 3:22-4 provides that:
Any ground for relief not raised in a prior proceeding under this rule, or in the proceedings resulting in the conviction, or in a post-conviction proceeding brought and decided prior to the adoption of this rule, or in any appeal taken in such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds (a) that the ground for *63 relief not previously asserted could not reasonably have been raised in any prior proceeding; or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.
"[D]efendant has the burden of proving that barring the petition would lead to injustice." State v. Mitchell, 126 N.J. 565, 587, 601 A.2d 198 (1992). Here, we deal with a substantive claim cognizable under the state and federal constitutions which defendant raised, although not directly, by virtue of his challenge to the consent search in the trial court proceedings and on direct appeal. Thus, defendant now suggests that he is not seeking to use the PCR procedure as a substitute for appeal. See R. 3:22-3. Rather, he asserts that the proofs needed to support his "profiling" claim are now available, although they were not at the time of trial and direct appeal.
Defendant notes that the Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling ("Interim Report") was not released until April of 1999, over two years following his motion to suppress and conviction. As a result, he argues that he "should not be prejudiced because the State officials were concealing their unlawful practices." While the issue of "racial profiling" was not spawned by the release of the "Interim Report," and had been raised in some cases prior to April of 1999, see State v. Kennedy, 247 N.J.Super. 21, 588 A.2d 834 (App.Div.1991); State v. Soto, 324 N.J.Super. 66, 734 A.2d 350 (Law Div.1996) (approved for publication after withdrawal and dismissal of the State's appeal on April 22, 1999), the Interim Report candidly acknowledged the existence of "racial profiling" which could not be ignored despite the defendant's previous failure to present evidence sufficient to satisfy the threshold necessary to obtain discovery.[6]State v. Ballard, supra, 331 N.J.Super. at 539-48, 752 A.2d 735; State v. Kennedy, supra.
In the Interim Report, the Attorney General's Review Team concluded, among other things:
1. Disproportionate Use of the Consent-to-Search Doctrine.
The data presented to us show that minority motorists were disproportionately subject to consent searches. Information concerning consent searches is particularly instructive in an examination of possible discriminatory practices since, by definition, the decision to request permission to conduct a search is a discretionary one. The only information available to us relates to consent searches that were actually executed, that is, instances where permission to search was granted. No data is available with respect to requests for permission to search that were denied. (The "early warning system" and recordkeeping protocols recommended in Part V of this Interim Report would require that this kind of information be documented for future analysis.)
While the Soto litigation and media attention has focused most intently on the initial decision by state troopers to stop vehicles, as noted throughout this Report, we embrace the notion that police officers may not rely upon inappropriate criteria in making any discretionary decision during the course of a "Terry" stop, including the decision to ask a motorist to knowingly and voluntarily *64 waive Fourth Amendment rights by consenting to a search.
We have concluded, based upon our preliminary review of the allegations and information developed in a number of internal affairs investigations, as well as anecdotal accounts from interviews with state troopers, that race and ethnicity may have influenced the exercise of discretion by some officers during the course of some traffic stops.[7]

[Interim Report at 28.]
As a result, the Interim Report provides that a request to conduct a consent search by the State Police may be authorized "only when facts are present that constitute a reasonable, articulable suspicion that the search would reveal evidence of a crime," id. at 85, and a consent decree entered in 1999 with the United States Department of Justice so provides. See State v. Payton, 342 N.J.Super. 106, 111-12, 775 A.2d 740 (App.Div.2001); State v. Carty, 332 N.J.Super. 200, 206, 753 A.2d 149 (App.Div.), certif. granted, 165 N.J. 605, 762 A.2d 219 (2000).[8] These concerns have led us to provide discovery in support of a "racial profiling" claim to a defendant who unsuccessfully challenged a "consent" search by a trooper on the Turnpike. Payton, supra.
We hold that defendant is entitled to discovery in support of his claim of "racial profiling" based on the aggregate of circumstances revealed by this record, including: (1) he filed a timely petition, see R. 3:22-12; (2) he filed a timely pretrial motion to suppress the evidence obtained following the stop on the New Jersey Turnpike by a state trooper; (3) the motion to suppress challenged the "consent search"; (4) the stop and "consent" search occurred in October 1995, after the time State v. Soto found that "profiling" by state troopers was occurring on the Turnpike, see 324 N.J.Super. at 84-85, 734 A.2d 350, but before the Attorney General and State Police endeavored to remedy the problem, see Ballard, supra, at 542-43, 752 A.2d 735; and (5) defendant challenged the stop and search on his unsuccessful direct appeal. In these circumstances, defendant is entitled to apply to the Designated Judge for discovery to support the claim that he was, in fact, a victim of racial profiling. Cf. State v. Burgess, 154 N.J. 181, 185, 712 A.2d 631 (1998) (PCR application not barred by R. 3:22-4 when issue was unsuccessfully raised in petition for certification).
The State has consistently acknowledged that "profiling" violates the Fifth *65 and Fourteenth Amendments, arguing that no Fourth Amendment right is violated, see, e.g., State v. Velez, 335 N.J.Super. 552, 554-55, 763 A.2d 290 (App.Div.2000), certif. dismissed, 167 N.J. 624, 772 A.2d 928 (2001), and acknowledges that "profiling" for drugs has always been unlawful in the context of a Turnpike stop. As such, defendant's "profiling" claim does not involve "a new rule of law," and we therefore face no issue of retroactivity. See Burgess, supra, 154 N.J. at 184-85, 712 A.2d 631; State v. Burstein, 85 N.J. 394, 402-12, 427 A.2d 525 (1981); State v. Yanovsky, 340 N.J.Super. 1, 7, 773 A.2d 711 (App.Div. 2001); State v. Staruch, 326 N.J.Super. 245, 251-52, 741 A.2d 110 (App.Div.1999) (all noting that issues of retroactivity are only presented when there has been a departure from existing law); and see generally, Teague v. Lane, 489 U.S. 288, 299-315, 109 S.Ct. 1060, 1069-78, 103 L.Ed.2d 334, 348-59 (1989), and State v. Purnell, 161 N.J. 44, 53-64, 735 A.2d 513 (1999) (outlining state and federal tests for determining whether new constitutional rules are to be applied retroactively to collateral attack). This is a case in which the defendant had no evidence to support the claim, and little opportunity of obtaining it before Soto was decided or the Interim Report was filed. In the totality of circumstances before us in this case, therefore, defendant can obtain discovery to pursue his claim on PCR.
There is no dispute that the Designated Judge has been given jurisdiction to entertain discovery applications on "profiling" claims by the State Police where they are cognizable.[9]See Ballard, supra, 331 N.J.Super. at 548-50, 752 A.2d 735. The Designated Judge shall consider the appropriate discovery in this case, after which defendant can seek reconsideration of his denied PCR petition before the trial judge.
Our disposition is without prejudice to consideration of defendant's other grounds for PCR in the event he is unsuccessful on the remand proceedings before the trial judge.[10]
The matter is remanded to the Law Division for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] A claim of an excessive sentence, as opposed to sentence legality, cannot be raised on post-conviction relief. See, e.g., State v. Ervin, 241 N.J.Super. 458, 468-473, 575 A.2d 491 (App.Div.1989), certif. denied, 121 N.J. 634, 583 A.2d 328 (1990); State v. Flores, 228 N.J.Super. 586, 594-96, 550 A.2d 752 (App. Div.1988), certif. denied, 115 N.J. 78, 556 A.2d 1220 (1989).
[2] The orders denying the petition were not entered until June 6, 2000 and July 24, 2000.
[3] Trooper Goldberg testified that he pointed out the discrepancy in stories to Mrs. White, and that "she became very nervous, and stated [that] they did not go to the hospital. They went directly to [her mother-in-law's] house."
[4] Trooper Goldberg testified that all three occupants in the car advised him that they did not have a driver's license nor any luggage in the vehicle, but that after the consent to search form was signed, defendant informed him that "he had a shopping bag in the trunk filled with clothes he had bought in New York."
[5] The co-defendants Sean and Jeanetta White pled guilty before defendant's trial.
[6] In the words of Soto, we are here concerned with profiling for "[t]he eradication of illegal drugs from our State." 324 N.J.Super. at 85, 734 A.2d 350.
[7] We have not seen the results of the "case-by-case review" which the Attorney General ordered to be "conducted of every consent search on the Turnpike in 1997 and 1998 to determine whether these searches were predicated upon a reasonable, articulable suspicion that the search would reveal evidence of a crime." Interim Report at 28-29. The Interim Report (at 25) reflected a disproportionately high number of searches of minorities by troopers from the Cranbury Barracks to which Goldberg reported the stop.
[8] Carty held "that articulable suspicion is a necessary prerequisite under the New Jersey Constitution to requesting a consent to search after a routine stop for a traffic violation." 332 N.J.Super. at 207, 753 A.2d 149. Unless the Supreme Court holds otherwise, Carty applies "to all pending cases, including those on direct appeal at the time Carty was decided, but not to those cases in which defendants had exhausted all avenues of direct relief at the time Carty was decided" on June 23, 2000. State v. Yanovsky, 340 N.J.Super. 1, 11, 773 A.2d 711 (App.Div.2001). Hence, this defendant would not be entitled to post-conviction relief under Carty. In any event, given the fact no passenger had a driver's license, their stories were not consistent, and the registration and other documents relating to the vehicle were not in their possession, Trooper Goldberg had articulable suspicion to request the consent.
[9] In fact, the Attorney General has indicated his consent to such discovery on a petition for post-conviction relief when the "profiling" claim was unsuccessfully expressly raised and denied on defendant's motion to suppress and direct appeal. State v. Walter Lewis, AM-952-00T1 (State's oral argument in opposition to defendant's unsuccessful motion for leave to appeal).
[10] We find no existing basis for upsetting the PCR judge's conclusions on the other issues raised on PCR and ordering immediate relief. R. 2:11-3(e)(2). However, we reserve decision thereon pending the remand proceedings.