886 A.2d 1066 (2005)
381 N.J. Super. 429
STATE of New Jersey, Plaintiff-Respondent,
v.
Calvin LEE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 2005.
Decided December 2, 2005.
Susan Brody, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Brian J. Neff, Assistant Deputy Public Defender, of counsel and on the brief).
Steven E. Braun, Chief Assistant Prosecutor, argued the cause for respondent (James F. Avigliano, Passaic County Prosecutor, attorney; Mr. Braun, of counsel and on the letter brief).
*1067 Before Judges KESTIN, ALLEY and FUENTES.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
Following upon the trial court's dismissal of his petition for post-conviction relief, defendant appeals from the denial of his motion for discovery that led to the dismissal. We affirm.
In 1996, defendant was convicted of first degree possession of CDS (cocaine) with intent to distribute; two related third-degree crimes involving possession of drugs; third-degree escape; and three fourth-degree crimes: possession of drugs, aggravated assault, and resisting arrest. The trial court imposed an extended-term sentence of fifty-five years' imprisonment with eighteen-and-one-half years of parole ineligibility for the first-degree crime and a consecutive one-and-one-half-year term for fourth-degree aggravated assault, along with concurrent sentences for the other convictions. We affirmed the convictions and sentences in an unpublished opinion, and the Supreme Court denied certification, 163 N.J. 396, 749 A.2d 370 (2000).
Defendant filed a petition for post-conviction relief in September 2000. In 2001, first by letter and then by formal motion, defendant sought discovery to support his claim that he had been the victim of racial profiling in the stop of a motor vehicle that had led to the discovery of the drugs on which the CDS charges were based and to the events that generated the other charges. See State v. Clark, 345 N.J.Super. 349, 355-59, 785 A.2d 59 (App. Div. 2001). The discovery motion was referred from the Law Division in Passaic County to Judge Barisonek in Union County. Judge Barisonek had been designated by the Supreme Court in a January 31, 2000 administrative order as the "sole judge" statewide to hear "all motions for discovery relating to racial profiling by the New Jersey State Police."
Asserting the attenuation exception to the exclusionary rule defendant sought to rely on, the State filed a counter-motion to remove the case from selective discovery proceedings. It was the State's position that defendant's criminal conduct committed following the stop of the vehicle constituted a break in the chain of events between the putatively unlawful stop and the discovery of contraband. The State contended that the evidence seized from the vehicle was, therefore, admissible even if the stop itself had been racially motivated, and that defendant should not be permitted discovery to make out his racial profiling claim.
Judge Barisonek heard argument on the motions on May 3, 2002, and decided them in an oral opinion that day. He ruled that defendant was not entitled to discovery by reason of the attenuation exception, and he remanded the matter back to Passaic County for disposition on the merits of the PCR application. We denied defendant's motion for leave to appeal from Judge Barisonek's ruling.
Absent any requests for relief from defendant on other grounds, Judge Marmo, before whom the application for post-conviction relief was pending, denied the petition. With that final disposition, defendant appeals as of right from Judge Barisonek's order denying his motion for discovery, and from the consequent order dismissing the petition for post-conviction relief. On appeal, he raises the following issues bearing exclusively on Judge Barisonek's ruling:
THE TRIAL COURT ERRED IN RULING THAT DEFENDANT IS NOT ENTITLED TO PURSUE A CLAIM OF RACIAL PROFILING.

*1068 I. THE TRIAL COURT ERRED IN CONCLUDING THAT THE ATTENUATION EXCEPTION TO THE EXCLUSIONARY RULE APPLIES.
II. CONSIDERING THAT THE DISCOVERY DEFENDANT SEEKS IS RELEVANT TO THE ISSUE OF WHETHER THE ATTENUATION EXCEPTION SHOULD APPLY, THE TRIAL COURT'S RULING WAS PREMATURE.
Before the 1996 trial in the matter, a hearing had been held on defendant's motion to suppress. The trial court's denial of that motion was based upon its findings in the hearing. The ruling denying the motion to suppress was a major focus in the merits appeal. In deciding that appeal, we recounted the facts that had been developed regarding the search. Judge Barisonek, in deciding the instant motions before him recited the same facts. We will not rehearse the details here.
After his detailed recitation of the facts of the matter, Judge Barisonek discussed our holdings in State v. Casimono, 250 N.J.Super. 173, 593 A.2d 827 (App.Div. 1991), and the courts' rulings in other cases on state and federal levels. In Casimono, we identified three general factors for
determin[ing] whether evidence has been obtained by means that are sufficiently independent to dissipate the taint of illegal police conduct[:] "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct."
[Id. at 183, 593 A.2d 827 (citations omitted).]
Defendant's arguments herein, both before Judge Barisonek and on appeal, focus on all three factors.
We went on in Casimono to hold that the defendant and his co-defendant
did not have a right to resist the searches [that we had already determined had been illegal for reasons unrelated to racial profiling] or the troopers' subsequent efforts to place them under arrest. And since defendant's physical confrontation with the troopers created a high potential for causing injury to the officers, the need to protect the troopers' safety outweighed whatever marginal deterrent to police misconduct might be provided by immunizing defendant's actions from criminal liability.
* * * *
... [T]he decisive factor supporting admission of the evidence of defendant's resisting arrest and hindering apprehension is the "intervening circumstance" of defendant's voluntary commission, subsequent to the illegal police conduct, of new criminal offenses with a high potential for causing injury to law enforcement officers. This "intervening circumstance" marks "the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."
The ... question is whether the illegal pat down searches ... require the suppression of the cocaine [in a paper bag] which they threw [away] and the reversal of defendant's conviction for possession of cocaine with intent to distribute.
* * * *
We hold that these actions by defendant were sufficiently independent of the prior illegal pat down searches to warrant the conclusion the discovery of the cocaine in the paper bag did not *1069 directly result from the police misconduct. * * * [T]here was a significant break in the chain of causation between the illegal searches and the discovery of the cocaine.
* * *
We also conclude that the cocaine in the paper bag was admissible on another alternative basis. [The co-defendant] was lawfully arrested for resisting arrest and hindering apprehension. Consequently, the police could have properly searched the interior compartment of his car incident to the arrest. * * * [T]he cocaine in the paper bag would inevitably have been discovered pursuant to a search incident to [the co-defendant's] lawful arrest after he physically resisted the pat down search and for this reason the evidence was not a fruit of the prior police misconduct.
[Id. at 184-88, 593 A.2d 827 (citations omitted).]
Based on the facts of the instant matter, and applying the principle of Casimono, Judge Barisonek concluded that the attenuation exception validated the admission of the drug evidence and that the motion for discovery to assist in making out a claim of racial profiling should be denied.
We recognize, as Judge Barisonek did, that Casimono did not involve issues of racial profiling. Indeed, we stated there that "[t]he stop of the car in which defendant was riding and the police order to defendant to get out of the car were lawful." Id. at 186, 593 A.2d 827. We cannot disregard the compelling qualities of the arguments advanced by defendant before Judge Barisonek and reiterated on appeal. Judge Barisonek framed those contentions as follows:
that because of the egregious conduct on the part of the State Police by engaging in acts of racial profiling, that even if there was a subsequent intervening act that occurred, that the constitutional infringements of the defendant's rights as a result of racial profiling is so egregious, the State should be barred from using that particular evidence. Also, it should be barred because of the nexus between the stop, the police misconduct, the subsequent arrest and finding of the evidence that incriminates the defendant[ ].
According the necessary regard to the important public policy premises upon which defendant's instant arguments are based, we also respect the perspective Judge Barisonek placed on those arguments and the value judgments that guided his decision:
The issue is whether or not [the conduct of defendant and his co-defendant] represents a sufficient break in the chain between the discretionary stop made by the police and their intervening acts.... [O]ne does not have the authority to resist [such] an illegal act and once an individual defendant takes action against a police officer who is in performance of his duties, whether they be unlawful or illegal, that person subjects himself to a criminal charge of either aggravated assault [or] resisting arrest....
In respect of defendant and his co-defendant in particular, Judge Barisonek went on to state:
Again, even giving the assumption that the initial stop may have been tainted because of profiling, and I am doing that, I want to make that clear on the record, I'm really not too concerned about the fact that the truck did not pull over to the side of the road immediately. When this becomes interesting is when the police then make the eventual stop, approach the vehicles and start taking their actions that were delineated on the record earlier, and the actions of the defendants including that of the driver *1070 to attempt to put the gear shift in drive. Obviously they are being detained by the police. They do not have a right to just walk away at that point and leave or run away or drive away. They are stopped by the police.
You do have a nexus I find and a legitimate issue as to whether or not there is a direct correlation to the initial discriminatory act in terms of stopping the vehicle and I accept that. But Parisi now says to the defendants you are under arrest. Again you look at 2C:29-2a, once the police officers announced an intent to arrest. There is not much of a question in this case that the trooper was in full uniform, marked cars, that is all addressed, and that the defendants knew this, these defendants, therefore, must submit. I am picking up from that point on as far as I am concerned.
Parisi announces they are under arrest. Whether or not the arrest is illegal or unlawful is of no consequence. The driver then runs from the truck and Calvin grabs Parisi's gun and pulls him into the vehicle. Then Calvin flees. Parisi goes to the truck to look between the seats for a weapon. Now, you can argue that his going to look for the weapon is correlated to the initial discriminatory stop. The State argues it is not because of the intervening criminal act of the resisting arrest and that they have every right in the world to go to that vehicle because of the concern about there being a weapon present because of Calvin reaching there. Also that if both police officers leave the scene to pursue and they return to the car to get the weapon there is going to be other people at risk if there is a weapon there.
The State argues that the search of the vehicle is not a discretionary post-arrest act on the part of the troopers. [Defense counsel] is arguing to me that there is a correlation under the Casimono case, under the Brown v. Illinois[, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)] case and under Johnson and that because of temporal proximity to the incident, that it happened quickly and that because of the egregious conduct on the part of the police being engaged in racial profiling that the exclusionary rule should apply. Also that the intervening circumstances, if they are to be believed, when weighed against that exclusionary argument are insignificant and that the police action in stopping the vehicle initially is so flagrant and that the police misconduct was so egregious that in fact this Court should find that there is insufficient merit to the State's argument to exclude the discriminatory stop. He also claims that it all should be treated as one incident and that the defendant is entitled to bring this back before the court on an issue involving racial profiling and be entitled to discovery.
Well, once, as I said, the individuals resist the actions of the police officers when the police announced an intent to arrest, they have no right to resist. There is no question that that is an intervening causal act on the part of the defendant independent of the discriminatory act. You say how is it independent of the discriminatory act? The reason they were resisting is they were stopped. Then you go back to the statute and Seymour and Battle and all the cases I cited that said it makes no difference if the acts of the police are illegal. You must submit.
The whole argument involving the eluding concept, the risk to the public should one resist police actions in bringing a car to a halt, the subjective nature of the decision of the defendant to make that decision that the police were acting *1071 illegally and, therefore, don't have to stay and will take off and elude. The act of the defendant is analogous to that in terms of resisting arrest by the police and fighting the police and subjecting not only the officers but other individuals who may be present at the scene, including other private citizens who may be around, to injury. I am not saying there were any other individuals around under the circumstances of these cases, but that is the very thing that the Court has to consider in terms of the analysis of how egregious the initial police objections were as against the intervening actions of the defendant and the intervening act is very egregious in terms of this resisting and eluding.
When you do the balancing issues under Casimono, the three factors, sure, there is some temporal proximity but it is not immediate, number one. Are the actions of the police in terms of racial discrimination egregious? Pretty egregious if you are a minority being stopped but there are also intervening circumstances and, again, I can't say that the flagrancy and purpose of the police misconduct is such to warrant the response of the defendants.
While the police may be acting under a color of unlawful authority, the acts of the defendants outweigh in my mind any discriminatory act that may have started the incident in terms of this type of a response. So the evidence is not subject to exclusion, "simply because it would not have come to light but for illegal actions of the police." This is again the quote. "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint" and I find that's what happened here. As I said, that was Wong Sun[, 371 U.S. 471] at 488 [83 S.Ct. 407, 9 L.Ed.2d 441 (1963)].
New Jersey has adopted that break-in-chain principle and I already discussed that under Casimono. * * * While the initial detainment or search may have been illegal, the search in Casimono, the searches in our case are not illegal. In our search the intervening act had taken place already and in fact in Calvin Lee and Ricky Lee they had been pulled over by the trooper, the troopers announced they were under arrest and instead of complying with the request to remain in the vehicle and keep their hands on the dashboard, Calvin continues to resist and then one runs off and the other one tries to pull the trooper through the window. The police have a right to take further action and arrest and under State v. Lund [119 N.J. 35, 573 A.2d 1376 (1990),] the police are entitled to conduct protective searches on the inside of the vehicle if they believe a motorist may be armed and dangerous.
Here they don't know what Calvin was doing in that truck and while you can argue that it was a correlation between the initial discriminatory stop you still had the intervening acts by the time the search took place and certainly they were independent of that discriminatory act. Based on the actions of these defendants, the trooper had reasonable articulable suspicion to believe that he may find a weapon in that car. This is based on the actions of the defendant and the struggle that ensued, so that the officer had reason to believe he was dealing with an armed and dangerous  potentially dangerous individual. This is regardless of whether he has probable cause to arrest. The individual, when he leaves the vehicle, can be subjected *1072 to a Terry search and the search can include the vehicle and could be sustained because the defendants could have returned to the vehicle and had there been a weapon, the weapon could have been within the reach of the defendant. That is what Lund citing State v. Esteves, 93 N.J. 498, 506-507 [461 A.2d 1128] says.
So, again, when you do the analysis under the Casimono factors, I find that there is sufficient intervening cause of a separate nature independent from the discriminatory act by the troopers either post-stop or pre-stop which would take it out of racial profiling. The only issue is whether or not there need be any evidentiary hearings similar to what I did on the other cases. I don't think you have to do them because the facts are all part of the existing records of the defendants. They had the benefit of hearings before a jury, before a court and there is sufficient proofs in the records that are before me to show that there was a sufficient break in the chain so as to exclude these from racial profiling cases.
The usual rule is that a conviction is almost invariably regarded as conclusive proof that a defendant committed a crime. The same considerations apply to convictions resulting from pleas. State v. Ramseur, 106 N.J. 123, 278 [524 A.2d 188] (1987).
In our cases the defendants have already been tried or pled to underlying crimes and as such an evidential hearing is not necessary to determine if the factual basis exists to demonstrate the crimes occurred, because the defendants have either admitted on their oath or sufficient facts have been proven beyond a reasonable doubt to show that these intervening crimes have occurred. That is based on a trial of a jury by one's peers and they have been found guilty. There is no need for me to do further hearings....
So the motion to exclude the cases of Ricky Lee and Calvin Lee ... are granted. Had the drugs been found prior to the intervening criminal act, I agree with the defense analysis and you would be entitled to discovery. Here, however, all the drugs, all the evidence upon which the State wishes to rely to support the convictions were found subsequent to the defendant's illegal acts and, therefore, there is ... not a sufficient nexus between the original discriminatory act and the subsequent searches even giving the defendant[ ] the benefit of the doubt that the initial stop[ ] [was] discriminatory. The motion[ ] for exclusion [is] granted.
We are in substantial agreement with Judge Barisonek's evaluation and decisional rationale. While fully sharing our dissenting colleague's distaste for and rejection of the practice of racial profiling, we also disfavor resistive and threatening conduct by a person unlawfully stopped or detained against the offending police officers. No good public purpose is served by ignoring or rewarding such anti-social acts. As the Supreme Court observed in State v. Badessa, 185 N.J. 303, 885 A.2d 430 (2005):
Unlike this case, in State v. Casimono, supra, the defendant's improper detention by the State Police did not warrant the exclusion of evidence of his resisting arrest because the defendant had committed an entirely new crime that placed the officers in physical danger. 250 N.J.Super. at 183-84 [593 A.2d 827]. In Casimono, supra, the defendant's "physical confrontation with the troopers created a high potential for causing injury to the officers," leading the court to conclude that "the need to protect the troopers' safety outweighed whatever marginal deterrent to police misconduct *1073 might be provided by immunizing defendant's actions from criminal liability." Id. at 184 [593 A.2d 827]. In those circumstances, the commission of a new crime was an intervening act that marked "the point at which the detrimental consequences of illegal police action [became] so attenuated that the deterrent effect of the exclusionary rule no longer justifie[d] its cost." Id. at 185 [593 A.2d 827] (internal quotation marks omitted); see also Seymour, supra, 289 N.J.Super. at 86-87 [672 A.2d 1273] (holding that even if police did not have reasonable and articulable suspicion to stop defendant's vehicle, endangering public by eluding police at high speeds was sufficient intervening act to purge taint of earlier unconstitutional action).
In conclusion, in the present matter the police officer's observations at the scene of the illegal stop of defendant's car were necessary to prove an essential element of refusal to take the breathalyzer test. Because that evidence must be suppressed, the State cannot prove a violation of the refusal statute. We see no reason to make an exception to the exclusionary rule in this case when the facts and policy concerns are sufficiently distinct from those in Casimono, supra, and Seymour, supra.

[Op. at 314-15, 885 A.2d 430.]
We see a considerable distinction, as a factual matter, between this case and Badessa; and more in common with Casimono and Seymour, suggesting a like resolution of the competing public policy considerations.
Accordingly, we affirm both Judge Barisonek's ruling denying the requested discovery and Judge Marmo's order dismissing defendant's petition for post-conviction relief.
FUENTES, J.A.D., dissenting.
Few issues have torn at the fabric of our State's justice system like racial profiling, the police-practice of stopping, detaining and interrogating motorists on our highways, merely because of the color of their skin. Despite the outcry from those who had been directly affected by this infamous practice, history shows that local law enforcement authorities were unable or unwilling to confront this problem. It took the intervention and coercive power of the United States Department of Justice before any meaningful reforms were implemented.
Defendant Calvin Lee, an African American man, has filed a post-conviction relief ("PCR") petition alleging that the police employed this unconstitutional, discriminatory tactic to obtain the evidence supporting his conviction for possession of illicit drugs.[1] As a threshold matter, defendant sought an order of discovery from the trial court. State v. Ballard, 331 N.J.Super. 529, 542-43, 752 A.2d 735 (App.Div.2000).
For the purpose of deciding whether defendant is entitled to this discovery, both the trial court and my colleagues in the majority have assumed that defendant can ultimately establish that the police's conduct was indeed motivated by racial bias. Despite this remarkable concession, the majority, adopting the trial court's reasoning, concludes that the drug evidence is otherwise admissible, because "the acts of the defendants outweigh ... any discriminatory act that may have started the incident." I respectfully disagree, and therefore dissent.
Before addressing the relevant legal issues, I will briefly describe the salient *1074 facts. The trial court gave the following account of what occurred after the police stopped defendant's car:
In response to the actions Mr. Lee allegedly looked behind him and started to make furtive motions inside the vehicle, began reaching between the two seats and appeared to be fumbling with something. The truck did not pull over to the side of the road but continued westward for about a mile before stopping in the lane of the exit ramp. After the vehicle stopped Trooper Mayer positioned herself at the right front of the police vehicle as did Trooper Parisi and drew near to the vehicle. Calvin Lee made eye contact with him and closed his window and lit a cigarette and began speaking to the driver. Upon request Mr. Calvin Lee opened his window and Parisi requested Ricky Lee's driver's license and vehicle registration. He could not produce either and he could not even tell the troopers to whom the vehicle belonged.
Parisi noticed that the key in the ignition was a single key with a small yellow tag attached to it. Suspecting the vehicle may have been stolen, Parisi asked to see the key and the key was relinquished and as that occurred Calvin Lee made a quick movement to the area between the seats. Parisi orders the occupants to place their hands on the dashboard. Both complied but Calvin Lee becomes verbally abusive and attempts to reach between the seats again. The trooper draws his weapon, orders them to return to their respective seats. Both defendants then attempted to exit the vehicle and were told to return to the vehicle. The driver proceeded to put the car in gear and drive as Calvin again was reaching between the seats. Trooper Parisi then puts his weapon to Calvin Lee's temple. Parisi informs the defendants they are under arrest. The driver then runs from the truck and simultaneously Calvin grabs Parisi's gun and pulls him into the vehicle. After a struggle Calvin flees on foot into a wooded area.
Parisi returns to the truck, looks between the seat for the weapon. Parisi doesn't find a weapon but finds a brown bag containing 11.48 ounces of cocaine and 18.31 ounces of marijuana. After the incident Calvin Lee was apprehended by State Police Sergeant Palumbo who brings him back to the scene and Parisi identifies him as the passenger of the vehicle and his fingerprints were later found on the truck.
Against this factual backdrop, the trial court framed the issue as to the admissibility of the drug evidence as follows:
The issue is whether or not [the conduct of defendant and his co-defendant] represents a sufficient break in the chain between the discretionary [unconstitutional] stop made by the police and their intervening acts.
Thus, applying this analytical construct to the facts of this case, the court reached the following conclusion:

[I]f the defendants, so to speak, sat on their hands, they would have had appropriate remedies due to racial profiling constitutional violations of the Fourth and Fifth Amendments to have that evidence excluded. They chose, however, not to do that. Their acts are independent I find of the original basis for the stop and the discovery of the item was a result of additional police actions that were not discriminatory in nature post-stop but rather based on what the police officers learned from their further investigations after the intervening acts of the defendants and the need to search that vehicle because of what was going on at the scene.

*1075 [Emphasis added.]
Stated differently, the trial court conceded that "but for" defendant's actions after the illegal stop, the drug evidence would have been excluded as the fruits of the initial unconstitutional and racially motivated stop. According to the trial court, the intervening event purges the taint from the drug evidence by creating an independent basis to sustain the prosecution of the drug charges.
The principle flaw in this analysis lies in a misapprehension of the public policy underpinning the exclusionary rule. This threshold error led to a misapplication of the "attenuation doctrine" line of cases. State v. Badessa, 185 N.J. 303, 885 A.2d 430 (2005); State v. Johnson, 118 N.J. 639, 573 A.2d 909 (1990); State v. Battle, 256 N.J.Super. 268, 606 A.2d 1119 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1992); State v. Casimono, 250 N.J.Super. 173, 593 A.2d 827 (App.Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 370, cert. denied, 504 U.S. 924, 112 S.Ct. 1978, 118 L.Ed.2d 577 (1992).
As the Supreme Court recently reaffirmed:

The primary purpose of the exclusionary rule "is to deter future unlawful police conduct" by denying the prosecution the spoils of constitutional violations. The exclusionary rule also "advances the `imperative of judicial integrity' and removes the profit motive from `lawless behavior.'"

Under the rule, the State is barred from introducing into evidence the "fruits" of an unlawful search or seizure by the police. ... Even evidence indirectly acquired by the police through a constitutional violation is subject to suppression.
[State v. Badessa, supra, 185 N.J. at 310-11, 885 A.2d 430 (emphasis added) (citations omitted).]

Racial Profiling
At the heart of racial profiling is the assumption that a person's race is a per se indication of criminality. This type of pernicious myth was not only invalid from a law enforcement perspective, but also served to further weaken the fragile confidence racial and ethnic minorities have had in the fairness of our justice system.
It is now undeniable, that for years, racial profiling was a de facto part of law enforcement tactics on our State's highways. State v. Ballard, supra, 331 N.J.Super. at 546-48, 752 A.2d 735. It was considered a standard operating procedure by troopers in the field and practiced without fear of reprisal, because it was condoned, if not encouraged outright, by the State Police hierarchy. See N.J. Office Of The Attorney General, Interim Report of the State Police Review Team Regarding Allegations Of Racial Profiling (April 20, 1999).
For those who have directly experienced this type of insidious abuse of police power, the resulting emotional trauma cannot be overstated. It provided concrete evidence that, despite the dismantling of the legal institutions supporting centuries of disparate treatment, the goal of eradicating racist practices remained illusory.
The harm caused by racial profiling, however, is not limited to the impact on its victims. When the coercive power of government is deliberately misused to target a historically discriminated class of citizens, the entire structure of our criminal justice system is undermined. This type of police misconduct, therefore, demands strict and unequivocal condemnation. It is, in my judgment, a profound and flagrant attack on justice itself, and a violation of the Equal Protection guarantees of the Fourteenth Amendment.[2]

*1076 Racial Profiling and the Exclusionary Rule

As noted earlier, the express purpose of the exclusionary rule is to deny the State the fruits obtained as a direct result of police misconduct. The practice of racial profiling was designed and intended to circumvent constitutional protections of individualized suspicion, as a means to unlawfully procure evidence. It must be emphasized, that the detection and apprehension of drug traffickers on our State's highways was the rationale for the practice of racial profiling. The police stopped minority motorists based on the unreasonable expectation that there was a probability that contraband would be found in their vehicles. Thus, the direct or indirect discovery of illicit drug evidence was precisely the fruit sought from the poisonous tree of racial profiling.
Here, for purposes of this discovery motion, both the trial court and my colleagues in the majority concede that defendant and his companion were subject to a racially motivated stop. Based on this undisputed fact, the exclusionary rule would mandate the suppression of any evidence discovered, directly or indirectly, as a result of this constitutional violation.

The Attenuation Doctrine
The majority relies on the "attenuation doctrine" to avoid reaching this otherwise ineluctable result. No published opinion in this State has examined the attenuation doctrine in the context of a racial profiling case. State v. Badessa, supra, 185 N.J. at 311-15, 885 A.2d 430 (fourth amendment unconstitutional motor vehicle stop); State v. Johnson, supra, 118 N.J. at 650-51, 573 A.2d 909 (fifth amendment Miranda violation); State v. Domicz, 377 N.J.Super. 515, 529-30, 873 A.2d 630 (App.Div.), certif. granted, 185 N.J. 268, 883 A.2d 1064 (2005) (fourth amendment warrantless search of defendant's home); State v. Pante, 325 N.J.Super. 336, 346-47, 739 A.2d 433 (App. Div.1999), certif. denied, 163 N.J. 76, 747 A.2d 285 (2000) (fifth amendment Miranda violation); State v. Worthy, 273 N.J.Super. 147, 155-56, 641 A.2d 282 (App.Div. 1994), aff'd, 141 N.J. 368, 661 A.2d 1244 (1995) (violation of New Jersey Wiretapping and Electronic Surveillance Control Act); State v. Garland, 270 N.J.Super. 31, 48, 636 A.2d 541 (App.Div.), certif. denied, 136 N.J. 296, 642 A.2d 1005 (1994) (fourth amendment Terry violation); State v. Stelzner, 257 N.J.Super. 219, 233-34, 608 A.2d 386 (App.Div.), certif. denied, 130 N.J. 396, 614 A.2d 619 (1992), (fourth amendment warrantless search of telephone records); State v. Casimono, supra, 250 N.J.Super. at 178-79, 593 A.2d 827 (fourth amendment Terry violation).
In Badessa, the Supreme Court examined the attenuation doctrine. The Court considered whether evidence gathered by the police after an unconstitutional motor vehicle stop should have been excluded in a prosecution for refusal to submit to a breathalyzer test. State v. Badessa, supra, 185 N.J. at 310-11, 885 A.2d 430. In so doing, the Court explained that:
[T]he exclusionary rule will not apply when the connection between the unconstitutional police action and the evidence becomes "`so attenuated as to dissipate *1077 the taint'" from the unlawful conduct. In those circumstances, withholding from the finder of fact relevant evidence far removed from the constitutional breach is a cost not justified by the exclusionary rule. Under both federal and state law, courts must determine whether law enforcement officials "have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct." To determine whether there is sufficient attenuation to purge the unconstitutional taint from evidence offered by the State, we look to three factors: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct."
[State v. Badessa, supra, 185 N.J. at 312-13, 885 A.2d 430 (citations omitted).]
Here, the police questioned defendant immediately after the racially motivated stop of his car. From these questions, Parisi determined that Ricky Lee, (the driver) could not produce his driver's license and vehicle registration, or even identify the owner of the car. Defendant also attempted to reach between the seats of the car, alerting the officer to a potentially dangerous situation. Armed with this information, Parisi ordered defendant and his fellow traveler to place their hands on the dashboard. Although both complied, defendant became verbally abusive.
As noted earlier, the trial judge found that after the occupants attempted to exit the vehicle, Parisi ordered them to remain in the car. At this point, the driver attempted to put the car in gear. The trooper then placed his gun against defendant's temple, and informed both men that they were under arrest.
As these facts illustrate, defendant's detention was complete before the occurrence of any intervening act. As noted in the State's brief, the intervening act occurred when defendant physically assaulted the officer, and fled from the scene. Even if defendant had not resisted, the trooper would have conducted a search of the vehicle incident to the unlawful, racially tainted arrest. That search would have revealed the existence of the drugs that were secreted between the seats of the car. All of these events flowed directly from the initial unconstitutional motor vehicle stop.
Under these circumstances, not only is the discovery of the relevant evidence not "so attenuated as to dissipate the taint from the unlawful conduct," but in fact, its discovery was irrevocably linked to the illegal stop. In other words, because the discovery of the drug evidence was not "far removed from the constitutional breach," the exclusionary rule applies.

Misapplication of the Attenuation Doctrine
Although I am satisfied that the attenuation doctrine is not germane to the proper resolution of this matter, the trial court's analysis compels me to discuss the three factors relevant to its applicability. The first factor is temporal proximity. In evaluating temporal proximity, the challenged evidence must spring directly from the illegal conduct. State v. Badessa, supra, 185 N.J. at 312, 885 A.2d 430. In my view, temporal proximity does not necessarily involve a pure time sensitive analysis. In this context, temporal proximity refers to a causal link between the illegal stop and the discovery of the evidence, whether or not such discovery is made immediately after the unlawful stop, or sometime shortly thereafter. Obviously, the greater the degree of temporal proximity between the police misconduct and the discovery of the evidence, the greater *1078 the probability that the evidence should be suppressed.
In Casimono, the discovery of the tainted evidence sprang immediately from the illegal pat down search. State v. Casimono, supra, 250 N.J.Super. at 186, 593 A.2d 827. In Casimono, we suppressed a dollar bill containing cocaine residue that defendant threw over a guardrail, because this action was in direct response to an illegal pat down search. Ibid. Here, although the actual discovery of the drug evidence may have occurred at a later point in time, the stage was set for the police to have discovered and seized the illicit drugs within minutes after the illegal stop. Thus, there is a close temporal proximity between the illegal stop and the discovery of the constitutionally tainted evidence.
The second factor is the existence of an intervening event. The trial court found that defendant's physical confrontation with the officer amounted to "a break in the chain" of events, sufficient to constitute an independent basis for admitting the drug evidence. The majority adopted the trial court's reasoning. What this analysis fails to appreciate, is that the physical confrontation occurred after the unconstitutional arrest that would have inevitably led to the discovery of the drug evidence. Thus, for purposes of the attenuation doctrine, there was no intervening event. The chain was forged between the police misconduct and the drug evidence before defendant engaged in any violent act against the police.
In the context of the attenuation doctrine, an intervening event must be completely unconnected to the original illegal conduct. The facts and holding in Casimono illustrates this point.
After the [defendant's] car [was lawfully] stopped, [the driver] got out and [the police officer] directed defendant also to get out of the car.
The troopers conducted pat down searches of both [the driver] and defendant. [The driver] resisted the pat down search by [one trooper], first refusing to take his hand out of his right front pocket and then throwing something from his pocket over the guardrail located along the shoulder of the roadway. [The other trooper] went to the aid of [the first trooper], at which point defendant returned to the car, where he retrieved a large brown paper bag which he threw over the guardrail. [The second trooper] returned to defendant and attempted to subdue him while [the first trooper] continued in his efforts to subdue [the driver]. As the two troopers were rolling on the ground with defendant and [the driver], a third occupant of the car ... got out of the back seat, jumped into the front seat and drove away. Both troopers shot at the fleeing vehicle. They then handcuffed [the driver] and defendant and pursued [the third occupant], who abandoned the vehicle, which had its back tires shot out, approximately a half mile away. [The third occupant] was apprehended later that day and a search of the area below the guardrail revealed a dollar bill containing cocaine residue and a brown paper bag containing 700 grams of cocaine.
[State v. Casimono, supra, 250 N.J.Super. at 178, 593 A.2d 827.]
Thus, in Casimono, the evidence that was directly linked to the illegal pat down search was suppressed, while the evidence obtained as a result of the lawful motor vehicle stop, coupled with the subsequent assaults upon the officers, was admitted. As Judge Skillman explained:
[D]efendant did not discard the cocaine in the paper bag in direct response to unlawful police conduct. The pat down search of defendant had been completed before defendant threw the paper bag *1079 over the guardrail. Furthermore, the paper bag was not in his possession but rather in the car. Thus, defendant had to voluntarily return to the car, in violation of [the] [t]rooper['s] [] direction to stand with his hands on the car, and retrieve the bag, before he could dispose of this evidence.
We hold that these actions by defendant were sufficiently independent of the prior illegal pat down searches to warrant the conclusion that the discovery of the cocaine in the paper bag did not directly result from the police misconduct. To be sure, the troopers' illegal pat down searches and defendant's retrieval and disposal of the cocaine occurred in close temporal proximity, which is one factor supporting suppression of the evidence thereby revealed. However, there are other more weighty factors which lead us to conclude that the discovery of the cocaine was not tainted by the prior illegal searches. The stop of the car in which defendant was riding and the police order to defendant to get out of the car were lawful. Thus, the only police misconduct consisted of the pat down searches, and the paper bag containing the cocaine was not located on the persons of either [the driver] or defendant but rather in the car, which was not subject to an unlawful search. Furthermore, defendant gained access to the bag only by disobeying a lawful police order that he remain outside the car. Therefore, there was a significant break in the chain of causation between the illegal searches and the discovery of the cocaine. (Emphasis added.)
[State v. Casimono, supra, 250 N.J.Super. at 186-87, 593 A.2d 827 (emphasis added) (citations omitted).]
In State v. Battle, supra, 256 N.J.Super. at 273, 606 A.2d 1119, a police officer stopped defendant's car under the mistaken impression that the vehicle did not have license plates. After realizing his error, instead of permitting defendant to resume his journey, the officer detained defendant long enough to notice what appeared to be drug paraphernalia inside the car. A further search of the vehicle revealed an unspecified amount of marijuana. Ibid. What transpired next in Battle was significantly more egregious, from the point of view of the actions taken by the defendant against the police, than what occurred in this case.
According to the officer, he then told defendant and the other occupants that they were under arrest. However, co-defendant Harris bolted from the group and began running down the highway. The officer directed Harris to stop or he would shoot. While the officer's attention was directed towards the fleeing Harris, defendant got back into his car and began to drive away. Consequently, the officer jumped into the passenger side of the car and tried to turn off the ignition. But defendant prevented the officer from stopping the car by elbowing his chest and hitting his arms. In response, the officer pulled out his gun and hit defendant over the head with it. At this point, with the car traveling approximately 40 miles per hour, defendant pushed the officer out of the car onto the middle lane of the highway. As a result, the officer suffered a broken foot and other injuries. Defendant continued his flight from the scene but surrendered to the police three days later. Harris also was apprehended but the third occupant escaped. The police never recovered the rolling paper or greenish brown vegetation which the officer observed in defendant's car.
[Ibid.]
*1080 Despite these facts, we upheld the trial court's suppression of the drug evidence from being used to prosecute drug charges, while allowing its use in connection with the prosecution of the assault and escape charges. Id. at 278, 606 A.2d 1119. The goal in Battle was to successfully harmonize two seemingly competing public policy objectives: the deterrence of police misconduct; and the prosecution of crimes that endanger the safety of police officers in the field.
The final, and in this case, the most critical factor of the attenuation doctrine is the flagrancy of the police misconduct. It bears repeating, that this factor has never been considered, analyzed, or applied in the context of a racial profiling case. The attenuation doctrine requires a reviewing court to balance the flagrancy of the police misconduct against the intervening event, in order to determine whether, as a matter of public policy, the prosecution of the intervening event outweighs the need to deter the particular police misconduct. Stated differently, if the police misconduct involved a limited and, under the circumstances, relatively minor intrusion into defendant's constitutionally protected rights, while the defendant's subsequent misconduct exposed the police to significant harm, then the connection between the initial police misconduct and the subsequent event becomes attenuated. Casimono supra, 250 N.J.Super. at 187, 593 A.2d 827.
This is not how the flagrancy factor was applied by the trial court here:
When you do the balancing issues under Casimono, the three factors, sure, there is some temporal proximity but it is not immediate, number one. Are the actions of the police in terms of racial discrimination egregious? Pretty egregious if you are a minority being stopped but there are also intervening circumstances and, again, I can't say that the flagrancy and purpose of the police misconduct is such to warrant the response of the defendants.

While the police may be acting under a color of unlawful authority, the acts of the defendants outweigh in my mind any discriminatory act that may have started the incident in terms of this type of a response.
[Emphasis added.]
Despite the inapplicability of the attenuation doctrine, as well as the absence of an intervening event relevant to the drug charges, I am nevertheless compelled to take issue with the trial court's failure to appreciate the true nature of the harm caused by racial profiling. At an earlier point in this dissent, I discussed the profound and pernicious effect this abhorrent practice has had in our State.
It cannot be overemphasized, that racial profiling connotes a segregationist mentality, harkening to a time when this type of malevolent stereotyping was not only considered acceptable, but legitimate. Short of actual physical violence, its difficult for me to imagine a more serious, and flagrant abuse of the State's police power.
Against this backdrop, if we accept that the initial stop of defendant's vehicle was the product of racial profiling, as both the trial court and my colleagues in the majority have done, I see no legal impediment to granting defendant's discovery motion. As noted by Justice Pollock in State v. Johnson, supra, 118 N.J. at 658, 573 A.2d 909, in none of the cases that have addressed the attenuation doctrine "was the incriminating evidence admitted to establish the offense for which the defendant had been illegally detained."
This case is not about immunizing defendant from crimes committed after the unconstitutional stop. In fact, defendant *1081 specifically concedes that the unlawful stop does not preclude his prosecution for the crimes committed against the troopers. Rather, defendant argues that the approach here should mirror our holding in Battle. There is no tension to be resolved between protecting our citizens from racial profiling, and protecting officers in the field from the inherent dangers of police work. In short, the potential dismissal of the drug charges does not sacrifice police safety at the altar of the Equal Protection Clause.
For these reasons, I respectfully dissent.
NOTES
[1] See State v. Clark, 345 N.J.Super. 349, 785 A.2d 59 (App.Div.2001), acknowledging the cognizability of racial profiling in the context of a PCR petition.
[2] Racial profiling has been characterized as "selective prosecution," State v. Ballard, supra, 331 N.J.Super. at 540, 752 A.2d 735. In my opinion, this is a misnomer. Selective prosecution implies an abuse of prosecutorial discretion. It assumes a scenario where the State unlawfully decides to enforce the law against only one of two equally guilty individuals. By contrast, racial profiling involves unlawful state action directed against a presumptively innocent person.