734 A.2d 350 (1996)
STATE of New Jersey
v.
Pedro SOTO, Delores Braswell, Larnie Boddy, Chauncey Davidson, Milton Lumpkin, Alfred S. Poole, Sam Gant, Donald Crews, Kim Harris, Ocie Norman, Antoine Peters, Floyd Porter, Theotis Williams a/k/a Walter Day, Paul Dacosta, Ronnie Lockhart, Terri Monroe and Kevin Jackson, Defendants.
Superior Court of New Jersey, Law Division, Gloucester County.
Decided March 4, 1996.
*351 P. Jeffrey Wintner, Deputy Public Defender I, for defendants Pedro Soto, Delores Braswell, Larnie Boddy, Chauncey Davidson, Milton Lumpkin and Alfred S. Poole (Susan L. Reisner, Public Defender, attorney).
Wayne E. Natale, Deputy Public Defender II, for defendant Sam Gant (Susan L. Reisner, Public Defender, attorney).
Carrie D. Dingle, Assistant Deputy Public Defender I, for defendants Donald Crews, Kim Harris, Ocie Norman, Antoine Peters, Floyd Porter, and Theotis Williams a/k/a Walter Day (Susan L. Reisner, Public Defender, attorney).
William H. Buckman, Moorestown, for defendants Paul DaCosta, Ronnie Lockhart and Terri Monroe.
Justin Loughry, Cherry Hill, for defendant Kevin Jackson (Tomar, Simonoff, *352 Adourian, O'Brien, Kaplan, Jacoby & Graziano, attorneys).
John M. Fahy, Senior Deputy Attorney General (Deborah T. Poritz, Attorney General of New Jersey, attorney) and Brent Hopkins, Assistant Gloucester County Prosecutor (Harris Y. Cotton, Gloucester County Prosecutor, attorney), for the State of New Jersey.
ROBERT E. FRANCIS, J.S.C.
These are consolidated motions to suppress under the equal protection and due process clauses of the Fourteenth Amendment.[1] Seventeen defendants of African ancestry claim that their arrests on the New Jersey Turnpike south of exit 3 between 1988 and 1991 result from discriminatory enforcement of the traffic laws by the New Jersey State Police.[2] After a lengthy hearing, I find defendants have established a prima facie case of selective enforcement which the State has failed to rebut requiring suppression of all contraband and evidence seized.
Defendants base their claim of institutional racism primarily on statistics. During discovery, each side created a database of all stops and arrests by State Police members patrolling the Turnpike between exits 1 and 7A out of the Moorestown Station for thirty-five randomly selected days between April 1988 and May 1991 from arrest reports, patrol charts, radio logs and traffic tickets. The databases are essentially the same. Both sides counted 3060 stops which the State found to include 1212 race identified stops (39.6%), the defense 1146 (37.4%).
To establish a standard against which to compare the stop data, the defense conducted a traffic survey and a violator survey. Dr. John Lamberth, Chairman of the Psychology Department at Temple University who I found is qualified as an expert in statistics and social psychology, designed both surveys.
The traffic survey was conducted over twenty-one randomly selected two and one-half hour sessions between June 11 and June 24, 1993 and between 8:00 a.m. and 8:00 p.m. at four sites, two northbound and two southbound, between exits 1 and 3 of the Turnpike. Teams supervised by Fred Last, Esq., of the Office of the Public Defender observed and recorded the number of vehicles that passed them except for large trucks, tractortrailers, buses and government vehicles, how many contained a "black" occupant and the state of origin of each vehicle. Of the 42,706 vehicles counted, 13.5% had a black occupant. Dr. Lamberth testified that this percentage is consistent with the 1990 Census figures for the eleven states from where almost 90% of the observed vehicles were registered. He said it is also consistent with a study done by the Triangle Group for the U.S. Department of Transportation with which he was familiar.
The violator survey was conducted over ten sessions in four days in July 1993 by Mr. Last traveling between exits 1 and 3 in his vehicle at sixty miles per hour on cruise control after the speedometer had been calibrated and observing and recording the number of vehicles that passed him, the number of vehicles he passed and how many had a black occupant. Mr. Last counted a total of 2096 vehicles other than large trucks, tractortrailers, buses and government vehicles of which 2062 or 98.1% passed him going in excess of sixty miles per hour including 306 with a black occupant equaling about 15% of those vehicles clearly speeding. Multiple violators, that is those violating the speed limit and *353 committing some other moving violation like tailgating, also equaled about 15% black. Dr. Lamberth testified that the difference between the percentage of black violators and the percentage of black travelers from the surveys is statistically insignificant and that there is no evidence traffic patterns changed between the period April 1988 to May 1991 in the databases and JuneJuly 1993 when the surveys were done.
Using 13.5% as the standard or benchmark against which to compare the stop data, Dr. Lamberth found that 127 or 46.2% of the race identified stops between exits 1 and 3 were of blacks constituting an absolute disparity of 32.7%, a comparative disparity of 242% (32.7% divided by 13.5%) and 16.35 standard deviations. By convention, something is considered statistically significant if it would occur by chance fewer than five times in a hundred (over two standard deviations). In case I were to determine that the appropriate stop data for comparison with the standard is the stop data for the entire portion of the Turnpike patrolled by the Moorestown Station in recognition of the fact that the same troopers patrol between exits 3 and 7A as patrol between exits 1 and 3, Dr. Lamberth found that 408 or 35.6% of the race identified stops between exits 1 and 7A were of blacks constituting an absolute disparity of 22.1%, a comparative disparity of 164% and 22.1 standard deviations.[3] He opined it is highly unlikely such statistics could have occurred randomly or by chance.[4]
Defendants also presented the testimony of Dr. Joseph B. Kadane, an eminently qualified statistician. Among his many credentials, Dr. Kadane is a full professor of statistics and social sciences at Carnegie Mellon University, headed the Department of Statistics there between 1972 and 1981 and is a Fellow of the American Statistical Association, having served on its board of directors and a number of its committees and held various editorships on its Journal. Dr. Kadane testified that in his opinion both the traffic and violator surveys were well designed, carefully performed and statistically reliable for analysis. From the surveys and the defense database, he calculated that a black was 4.85 times as likely as a white to be stopped between exits 1 and 3. This calculation led him to "suspect" a racially non-neutral stopping policy. While he noted that the surveys were done in 1993 and compared to data from 1988 to 1991, he was nevertheless satisfied that the comparisons were useable and accurate within a few percent. He was not concerned that the violator survey failed to count cars going less than sixty miles per hour and travelling behind Mr. Last when he started a session. He was concerned, however, with the fact that only 37.4% of the stops in the defense database were race identified.[5] In order to determine if the comparisons were sensitive to the missing racial data, he did *354 calculations performed on the log odds of being stopped. Whether he assumed the probability of having one's race recorded if black and stopped is the same as if white and stopped or two or three times as likely, the log odds were still greater than.99 that blacks were stopped at higher rates than whites on the Turnpike between exits 1 and 3 during the period April 1988 to May 1991. He therefore concluded that the comparisons were not sensitive to the missing racial data.
Supposing that the disproportionate stopping of blacks was related to police discretion, the defense studied the traffic tickets issued by State Police members between exits 1 and 7A on the thirty-five randomly selected days broken down by State Police unit.[6] There are 533 racially identified tickets in the databases issued by either the now disbanded Radar Unit, the Tactical Patrol Unit or general road troopers ("Patrol Unit"). The testimony indicates that the Radar Unit focused mainly on speeders using a radar van and chase cars and exercised limited discretion regarding which vehicles to stop. The Tac-Pac concentrates on traffic problems at specific locations and exercises somewhat more discretion as regards which vehicles to stop. Responsible to provide general law enforcement, the Patrol Unit exercises by far the most discretion among the three units. From Mr. Last's count, Dr. Lamberth computed that 18% of the tickets issued by the Radar Unit were to blacks, 23.8% of the tickets issued by the Tac-Pac were to blacks while 34.2% of the tickets issued by the Patrol Unit were to blacks. South of exit 3, Dr. Lamberth computed that 19.4% of the tickets issued by the Radar Unit were to blacks, 0.0% of the tickets issued by the Tac-Pac were to blacks while 43.8% of the tickets issued by the Patrol Unit were to blacks. In his opinion, the Radar Unit percentages are statistically consistent with the standard established by the violator survey, but the differences between the Radar Unit and the Patrol Unit between both exits 1 and 3 and 1 and 7A are statistically significant or well in excess of two standard deviations.
The State presented the testimony of Dr. Leonard Cupingood to challenge or refute the statistical evidence offered by the defense. I found Dr. Cupingood is qualified to give expert testimony in the field of statistics based on his Ph.D in statistics from Temple and his work experience with the Center for Forensic Economic Studies, a for profit corporation headquartered in Philadelphia. Dr. Cupingood collaborated with Dr. Bernard Siskin, his superior at the Center for Forensic Economic Studies and a former chairman of the Department of Statistics at Temple.
Dr. Cupingood had no genuine criticism of the defense traffic survey. Rather, he centered his criticism of the defense statistical evidence on the violator survey. Throughout his testimony he maintained that the violator survey failed to capture the relevant data which he opined was the racial mix of those speeders most likely to be stopped or the "tail of the distribution." He even recommended the State authorize him to design a study to collect this data, but the State declined. He was unclear, though, how he would design a study to ascertain in a safe way the vehicle going the fastest above the speed limit at a given time at a given location and the race of its occupants without involving the credibility of State Police members. In any event, his supposition that maybe blacks drive faster than whites above the speed limit was repudiated by all State Police members called by the State who were questioned about it. Colonel Clinton Pagano, Trooper Donald Nemeth, Trooper Stephen Baumann and Detective Timothy Grant each testified that blacks drive indistinguishably from whites. Moreover, *355 Dr. Cupingood acknowledged that he knew of no study indicating that blacks drive worse than whites. Nor could he reconcile the notion with the evidence that 37% of the unticketed stops between exits 1 and 7A in his database were black and 63% of those between exits 1 and 3. Dr. James Fyfe, a criminal justice professor at Temple who the defense called in its rebuttal case and who I found is qualified as an expert in police science and police procedures, also testified that there is nothing in the literature or in his personal experience to support the theory that blacks drive differently from whites.[7]
Convinced in his belief that the defense 15% standard or benchmark was open to question, Dr. Cupingood attempted to find the appropriate benchmark to compare with the databases. He did three studies of presumedly race-blind stops: night stops versus day stops; radar stops versus non-radar stops and drinking driving arrests triggered by calls for service.
In his study of night stops versus day stops, he compared the percentage of stops of blacks at night between exits 1 and 7A in the databases with the percentage of stops of blacks during daytime and found that night stops were 37.3% black versus 30.2% for daytime stops. Since he presumed the State Police generally cannot tell race at night, he concluded the higher percentage for night stops of blacks supported a standard well above 15%. His premise that the State Police generally cannot recognize race at night, however, is belied by the evidence. On July 16, 1994 between 9:40 p.m. and 11:00 p.m. Ahmad S. Corbitt, now an assistant deputy public defender, together with Investigator Minor of the Office of the Public Defender drove on the Turnpike at 55 miles per hour for a while and parked perpendicular to the Turnpike at a rest stop for a while to see if they could make out the races of the occupants of the vehicles they observed. Mr. Corbitt testified that the two could identify blacks versus whites about 80% of the time in the moving mode and close to 100% in the stationary mode. Over and above this proof is the fact the databases establish that the State Police only stopped an average of eight black occupied vehicles per night between exits 1 and 7A. Dr. Cupingood conceded a trooper could probably identify one or two black motorists per night.
Next, in his study of radar stops versus non-radar stops, Dr. Cupingood focused on the race identified tickets where radar was used in the databases and found that 28.5% of them were issued to blacks. Since he assumed that radar is race neutral, he suggested 28 .5% might be the correct standard. As Dr. Kadane said in rebuttal, this study is fundamentally flawed because it assumes what is in question or that the people stopped are the best measure of who is eligible to be stopped. If racial prejudice were afoot, the standard would be tainted. In addition, although a radar device is race-blind, the operator may not be. Of far more significance is the defense study comparing the traffic tickets issued by the Radar, Tac-Pac and Patrol Units which shows again that where radar is used by a unit concerned primarily with speeders and acting with little or no discretion like the Radar Unit, the percentage of tickets issued to blacks is consistent with their percentage on the highway.
*356 And lastly in his effort to find the correct standard, Dr. Cupingood considered a DUI study done by Lieutenant Fred Madden, Administrative Officer of the Records and Identification Section of the State Police. Lt. Madden tabulated DUI arrests between July 1988 and June 1991 statewide, statewide excluding the State Police, for Troop D of the State Police which patrols the entire length of the Turnpike, for Moorestown Station of Troop D and for Moorestown Station south of exit 3 broken down by race and between patrol related versus calls for service (i.e. accidents, motorist aids and other-the arrested motorist coming to the attention of the State Police by a toll-taker or civilian). Since Dr. Cupingood believed DUI arrests from calls for service were race neutral, he adopted the percentage of DUI arrests of blacks for the Moorestown Station from calls for service of 23% as a possible standard. Like his radar versus non-radar stop study, his use of the DUI arrest study is fundamentally flawed because he assumed what is in question. Further, he erred in assuming that DUI arrests from calls for service involve no discretion. While the encounters involve no discretion, the arrests surely do. He admitted that race/discretion may explain the following widespread statistics in the DUI arrest study:

Statewide (all departments) 12% black
Statewide (excluding State
Police) 10.4% black
State Police 16% black
Troop D 23% black
Moorestown Station 34% black
Moorestown Station patrol related 41% black
Moorestown Station patrol related
south of exit 3 50% black

After hearing the testimony of Kenneth Ruff and Kenneth Wilson, two former troopers called by the defense who were not reappointed at the end of their terms and who said they were trained and coached to make race based "profile" stops to increase their criminal arrests, the State asked Dr. Cupingood to study the race identified stops in his database and see how many possessed the profile characteristics cited by Ruff and Wilson, particularly how many were young (30 or under), black and male. Dr. Cupingood found that only 11.6% of the race identified stops were of young black males and only 6.6% of all stops were of young black males.
The defense then conducted a profile study of its own. It concentrated on the race identified stops of just blacks issued tickets and found that an adult black male was present in 88% of the cases where the gender of all occupants could be determined and that where gender and age could be determined, a black male 30 or younger was present in 63% of the cases. The defense study is more probative because it does concentrate on just stops of blacks issued tickets eliminating misleading comparisons with totals including whites or whites and a 62.6% group of race unknowns. Neither side, of course, could consider whether the blacks stopped and not issued tickets possessed profile characteristics since the databases contain no information about them.
Dr. Cupingood's so-called Mantel-Haentzel analysis ended the statistical evidence. He put forward this calculation of "expected black tickets" in an attempt to disprove the defense study showing the Patrol Unit, the unit with the most discretion, ticketed blacks at a rate not only well above the Radar and Tac-Pac Units, but also well above the standard fixed by the violator survey. The calculation insinuates that the Patrol Unit issued merely 5 excess tickets to blacks beyond what would have been expected. The calculation is worthless. First and foremost, Dr. Cupingood deleted the non-radar tickets which presumably involved a greater exercise of discretion. The role police discretion played in the issuance of tickets to blacks was the object of the defense study. Under the guise of comparing only things similarly situated, he thereupon deleted any radar tickets not issued in one of the four time periods he divided each of the thirty-five randomly selected days into for *357 which there was not at least one race identified radar ticket issued by the Patrol Unit and at least one by the combined Radar, Tac-Pac Unit. He provided no justification for either creating the 140 time periods or combining the tickets of the Radar and Tac-Pac Units. To compound his defective analysis, he pooled the data in each time period into a single number and employed the resultant weighted average of the two units to compute the expected and excess, if any, tickets issued to blacks. By using weighted averages, he once again assumed the answer to the question he purported to address. He assumed the Patrol Unit gave the same number of tickets to blacks as did the Radar, Tac-Pac Unit, rather than test to see if it did. Even after "winnowing" the data, the comparison between the Patrol Unit and the Radar, Tac-Pac Unit is marginally statistically significant. Without winnowing, Dr. Kadane found the comparison of the radar tickets issued by the Patrol Unit to blacks with the radar tickets issued by the Radar, Tac-Pac Unit to blacks constituted 3.78 standard deviations which is distinctly above the 5% standard of statistical significance.
The defense did not rest on its statistical evidence alone. Along with the testimony of former troopers Kenneth Ruff and Kenneth Wilson about having been trained and coached to make race based profile stops but whose testimony is weakened by bias related to their not having been reappointed at the end of their terms, the defense elicited evidence through cross-examination of State witnesses and a rebuttal witness, Dr. James Fyfe, that the State Police hierarchy allowed, condoned, cultivated and tolerated discrimination between 1988 and 1991 in its crusade to rid New Jersey of the scourge of drugs.
Conjointly with the passage of the Comprehensive Drug Reform Act of 1987 and to advance the Attorney General's Statewide Action Plan for Narcotics Enforcement issued in January 1988 which "directed that the enforcement of our criminal drug laws shall be the highest priority law enforcement activity", Colonel Pagano formed the Drug Interdiction Training Unit (DITU) in late 1987 consisting of two supervisors and ten other members, two from each Troop selected for their successful seizure statistics, "... to actually patrol with junior road personnel and provide critical on-the-job training in recognizing potential violators." State Police Plan For Action dated July 7, 1987, at p. 14. According to Colonel Pagano, the DITU program was intended to be one step beyond the existing coach program to impart to newer troopers insight into drug enforcement and the "criminal program" (patrol related arrests) in general. DITU was disbanded in or around July 1992.
No training materials remain regarding the training DITU members themselves received, and few training materials remain regarding the training DITU members provided the newer troopers except for a batch of checklists.[8] Just one impact study was ever prepared regarding the effectiveness of the DITU program rather than periodic impact evaluations and studies as required by S.O.P. F4 dated January 12, 1989, but this one undated report marked D-62 in evidence only provided statistics about the number of investigations conducted, the number of persons involved and the quantity and value of drugs seized without indicating the race of those involved or the number of fruitless investigations broken down by race. In the opinion of Dr. Fyfe, retention of training materials is important for review of the propriety of the training and to discern *358 agency policy, and preparation of periodic impact evaluations and studies is important not only to determine the effectiveness of the program from a numbers standpoint, but more than that to enable administration to monitor and control the quality of the program and its impact on the public, especially a crackdown program like DITU which placed so much emphasis on stopping drug transportation by the use of "consents" to search following traffic stops in order to prevent constitutional excesses.
Despite the paucity of training materials and lack of periodic and complete impact evaluations and studies, a glimpse of the work of DITU emerges from the preserved checklists and the testimony of Sergeants Brian Caffrey and David Cobb. Sergeant Caffrey was the original assistant supervisor of DITU and became the supervisor in 1989. Sergeant Cobb was an original member of DITU and became the assistant supervisor in 1989. Sergeant Caffrey left DITU sometime in 1992, Sergeant Cobb sometime in 1991. Both testified that a major purpose of DITU was to teach trainees tip-offs and techniques about what to look for and do to talk or "dig" their way into a vehicle after, not before, a motor vehicle stop to effectuate patrol related arrests. Both denied teaching or using race as a tip-off either before or after a stop. Nevertheless, Sergeant Caffrey condoned a comment by a DITU trainer during the time he was the supervisor of DITU stating:
"Trooper Fash previously had DITU training, and it showed in the way he worked. He has become a little reluctant to stop cars in lieu [sic] of the Channel 9 News Report. He was told as long as he uses Title 39 he can stop any car he wants. He enjoys DITU and would like to ride again."
As the defense observes in its closing brief, "Why would a trooper who is acting in a racially neutral fashion become reluctant to stop cars as a result of a news story charging that racial minorities were being targeted [by the New Jersey State Police]?" Even A.A.G. Ronald Susswein, Deputy Director of the Division of Criminal Justice, acknowledged that this comment is incomplete because it fails to add the caveat, "as long as he doesn't also use race or ethnicity." Further, Sergeant Caffrey testified that "ethnicity is something to keep in mind" albeit not a tip-off and that he taught attendees at both the annual State Police in-service training session in March 1987 and the special State Police in-service training sessions in July and August 1987 that Hispanics are mainly involved in drug trafficking and showed them the film Operation Pipeline wherein the ethnicity of those arrested, mostly Hispanics, is prominently depicted. Dr. Fyfe criticized Sergeant Caffrey's teaching Hispanics are mainly involved and his showing Operation Pipeline as well as the showing of the Jamaican Posse film wherein only blacks are depicted as drug traffickers at the 1989 annual State Police in-service training session saying trainers should not teach what they do not intend their trainees to act upon. At a minimum, teaching Hispanics are mainly involved in drug trafficking and showing films depicting mostly Hispanics and blacks trafficking in drugs at training sessions worked at cross-purposes with concomitant instruction pointing out that neither race nor ethnicity may be considered in making traffic stops.
Key corroboration for finding the State Police hierarchy allowed and tolerated discrimination came from Colonel Pagano. Colonel Pagano was Superintendent of the State Police from 1975 to February 1990. He testified there was a noisy demand in the 1980s to get drugs off the streets. In accord, Attorney General Cary Edwards and he made drug interdiction the number one priority of law enforcement. He helped formulate the Attorney General's Statewide Action Plan for Narcotics Enforcement and established DITU within the State Police. He kept an eye on DITU through conversations with staff officers and Sergeants Mastella and Caffrey and *359 review of reports generated under the traditional reporting system and D-62 in evidence. He had no thought DITU would engage in constitutional violations. He knew all State Police members were taught that they were guardians of the Constitution and that targeting any race was unconstitutional and poor police practice to boot. He recognized it was his responsibility to see that race was not a factor in who was stopped, searched and arrested. When he became Superintendent, he formed the Internal Affairs Bureau to investigate citizen complaints against State Police members to maintain the integrity of the Division. Substantiated deviations from regulations resulted in sanctions, additional training or counseling.
More telling, however, is what Colonel Pagano said and did, or did not do, in response to the Channel 9 exposé entitled "Without Just Cause" which aired in 1989 and which troubled Trooper Fash and what he did not do in response to complaints of profiling from the NAACP and ACLU and these consolidated motions to suppress and similar motions in Warren and Middlesex Counties. He said to Joe Collum of Channel 9 that "[violating rights of motorists was] of serious concern [to him], but no where near the concern that I think we have got to look to in trying to correct some of the problems we find with the criminal element in this State" and "the bottom line is that those stops were not made on the basis of race alone." (emphasis added) Since perhaps these isolated comments were said inadvertently or edited out of context, a truer reflection of his attitude about claims of racism would appear to be his videotaped remarks shown all members of the State Police at roll call in conjunction with the WOR series. Thereon he clearly said that he did not want targeting or discriminatory enforcement and that "[w]hen you put on this uniform, you leave your biases and your prejudices behind." But he also said as regarded the charge of a Trenton school principal named Jones that he had been stopped on the Turnpike and threatened, intimidated and assaulted by a trooper, "We know that the teacher assaulted the trooper. He didn't have a driver's license or a registration for his fancy new Mercedes." (emphasis added) And he called Paul McLemore, the first African-American trooper in New Jersey and now a practicing attorney and who spoke of discrimination within the ranks of the State Police, "an ingrate." And he told the members to "keep the heat on" and then assured them:
"...[H]ere at Division Headquarters we'll make sure that when the wheels start to squeak, we'll do whatever we can to make sure that you're supported out in the field.... Anything that goes toward implementing the Drug Reform Act is important. And, we'll handle the squeaky wheels here."
He admitted the Internal Affairs Bureau was not designed to investigate general complaints, so he could not refer the general complaints of discrimination to it for scrutiny. Yet he never requested the Analytical Unit to investigate stop data from radio logs, patrol charts and tickets or search and seizure data from arrest reports, operations reports, investigation reports and consent to search forms, not even after the Analytical Unit informed him in a report on arrests by region, race and crime that he had requested from it for his use in the WOR series that "... arrests are not a valid reflection of stops (data relative to stops with respect to race is not compiled)." The databases compiled for these motions attest, of course, to the fact that race identified stop data could have been compiled. He testified he could not launch an investigation into every general complaint because of limited resources and that there was insufficient evidence of discriminations in the Channel 9 series, the NAACP and ACLU complaints and the various motions to suppress for him to spend his "precious" resources. In short, he left the issue of discrimination up to the courts and months of testimony in this and other counties at State expense.
The right to be free from discrimination is firmly supported by the Fourteenth *360 Amendment to the United States Constitution and the protections of Article I, paragraphs 1 and 5 of the New Jersey Constitution of 1947. To be sure, "[t]he eradication of the `cancer of discrimination' has long been one of our State's highest priorities." Dixon v. Rutgers, The State University of N.J., 110 N.J. 432, 451, 541 A.2d 1046 (1988). It is indisputable, therefore, that the police may not stop a motorist based on race or any other invidious classification. See State v. Kuhn, 213 N.J.Super. 275, 517 A.2d 162 (1986).
Generally, however, the inquiry for determining the constitutionality of a stop or a search and seizure is limited to "whether the conduct of the law enforcement officer who undertook the [stop or] search was objectively reasonable, without regard to his or her underlying motives or intent." State v. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983). Thus, it has been said that the courts will not inquire into the motivation of a police officer whose stop of a vehicle was based upon a traffic violation committed in his presence. See United States v. Smith, 799 F.2d 704, 708-709 (11th Cir.1986); United States v. Hollman, 541 F.2d 196, 198 (8th Cir.1976); cf. United States v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). But where objective evidence establishes "that a police agency has embarked upon an officially sanctioned or de facto policy of targeting minorities for investigation and arrest," any evidence seized will be suppressed to deter future insolence in office by those charged with enforcement of the law and to maintain judicial integrity. State v. Kennedy, 247 N.J.Super. 21, 588 A.2d 834 (App.Div. 1991).
Statistics may be used to make out a case of targeting minorities for prosecution of traffic offenses provided the comparison is between the racial composition of the motorist population violating the traffic laws and the racial composition of those arrested for traffic infractions on the relevant roadway patrolled by the police agency. Wards Cove Packing Co. v. Atonio, supra; State v. Kennedy, 247 N.J.Super. at 33-34, 588 A.2d 834. While defendants have the burden of proving "the existence of purposeful discrimination," discriminatory intent may be inferred from statistical proof presenting a stark pattern or an even less extreme pattern in certain limited contexts. McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct 1756, 95 L.Ed.2d 262 (1987). Kennedy, supra, implies that discriminatory intent may be inferred from statistical proof in a traffic stop context probably because only uniform variables (Title 39 violations) are relevant to the challenged stops and the State has an opportunity to explain the statistical disparity. "[A] selection procedure that is susceptible of abuse... supports the presumption of discrimination raised by the statistical showing." Castaneda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).
Once defendants expose a prima facie case of selective enforcement, the State generally cannot rebut it by merely calling attention to possible flaws or unmeasured variables in defendants' statistics. Rather, the State must introduce specific evidence showing that either there actually are defects which bias the results or the missing factors, when properly organized and accounted for, eliminate or explain the disparity. Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); EEOC v. General Telephone Co. of Northwest, Inc., 885 F.2d 575 (9th Cir.1989). Nor will mere denials or reliance on the good faith of the officers suffice. Castaneda v. Partida, 430 U.S. at 498 n. 19, 97 S.Ct. 1272, 51 L.Ed.2d 498.
Here, defendants have proven at least a de facto policy on the part of the State Police out of the Moorestown Station of targeting blacks for investigation and arrest between April 1988 and May 1991 both south of exit 3 and between exits 1 and 7A of the Turnpike. Their surveys satisfy Wards Cove, supra. The statistical disparities and standard deviations revealed are indeed stark. The discretion devolved upon general road *361 troopers to stop any car they want as long as Title 39 is used evinces a selection process that is susceptible of abuse. The utter failure of the State Police hierarchy to monitor and control a crackdown program like DITU or investigate the many claims of institutional discrimination manifests its indifference if not acceptance. Against all this, the State submits only denials and the conjecture and flawed studies of Dr. Cupingood.
The eradication of illegal drugs from our State is an obviously worthy goal, but not at the expense of individual rights. As Justice Brandeis so wisely said dissenting in Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928):
"Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evilminded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."
Motions granted.
NOTES
[1] The motions also include claims under the Fourth Amendment, but they were severed before the hearing to await future proceedings if not rendered moot by this decision.
[2] Originally, twenty-three defendants joined in the motions. On the first day of the hearing, November 28, 1994, I dismissed the motions of Darrell Stanley, Roderick Fitzgerald, Fred Robinson, Charles W. Grayer, Keith Perry and Alton Williams due to their unexplained nonappearances.
[3] Dr. Lamberth erred in using 13.5% as the standard for comparison with the stop data. The violator survey indicates that 14 .8%, rounded to 15%, of those observed speeding were black. This percentage is the percentage Dr. Lamberth should have used in making statistical comparisons with the stop data in the databases. Nonetheless, it would appear that whatever the correctly calculated disparities and standard deviations are, they would be nearly equal to those calculated by Dr. Lamberth.
[4] In this opinion I am ignoring the arrest data in the databases and Dr. Lamberth's analysis thereof since neither side produced any evidence identifying the Turnpike population between exits 1 and 3 or 1 and 7A eligible to be arrested for drug offenses or otherwise. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).
[5] That 62.6 percent of the stops in the defense database are not race identified is a consequence of both the destruction of the radio logs for ten of the thirty-five randomly selected days in accordance with the State Police document retention policy and the frequent dereliction of State Police members to comply with S.O.P. F3 effective July 13, 1984 requiring them to communicate by radio to their respective stations the race of all occupants of vehicles stopped prior to any contact.
[6] Of the 3060 stops in the databases, 1292 are ticketed stops. Hence, no tickets were issued for nearly 60% of the stops.
[7] During the hearing the State did attempt to introduce some annual speed surveys conducted on the Turnpike by the New JerseyDepartment of Transportation which the State represented would contradict a conclusion of the violator survey that 98.1% of the vehicles observed travelled in excess of sixty miles per hour. Besides noting that the State knew of these surveys long before the hearing and failed to produce them in discovery, I denied the proffer mainly because the surveys lacked racial data and also because there was a serious issue over their trustworthiness for admission under N.J.R.E. 803(c)(8) since the surveys were done to receive federal highway dollars. The critical information here is the racial mix of those eligible to be stopped, not the percentage of vehicles exceeding the speed limit.
[8] Although DITU kept copies of all arrest, operations and investigation reports and consent to search forms growing out of encounters with the public during training for a time at its office, the copies were destroyed sometime in 1989 or 1990 and before they were sought in discovery. The originals of these reports and forms were filed at the trainee's station and incorporated into the State Police "traditional reporting system" making them impossible to ferret out now.