887 A.2d 704 (2005)
382 N.J. Super. 27
STATE of New Jersey, Plaintiff-Respondent,
v.
Nelson GONZALEZ, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Alfonso Herrerra, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 15, 2005.
Decided December 20, 2005.
Yvonne Smith Segars, Public Defender, attorney for appellant Nelson Gonzalez (Edgar F. Devine, Jr., Designated Counsel, of counsel and on the brief).
Appellant filed a supplemental pro se brief in A-0371-03T4.
*705 Peter C. Harvey, Attorney General, attorney for respondent in A-0371-03T4 (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).
Yvonne Smith Segars, Public Defender, attorney for appellant Alfonso Herrerra (Richard Sparaco, Designated Counsel, of counsel and on the brief).
Thomas S. Ferguson, Warren County Prosecutor, attorney for respondent in A-5368-02T4 (Leeann Cunningham, Assistant Prosecutor, of counsel and on the brief).
Before Judges STERN, WECKER and GRAVES.
The opinion of the court was delivered by
WECKER, J.A.D.
These appeals from separate orders denying each defendant's motion for post-conviction relief (PCR) include appeals from interim orders denying discovery. We have consolidated these appeals for purposes of this opinion because they arise out of the same highway stop and ensuing events, and present once again the question of a defendant's right to so-called "profiling" discovery. We now reverse the order denying discovery and remand for entry of a discovery order and reconsideration of defendants' PCR motions in light of the discovery provided.
Defendants were tried separately on an indictment charging each of them with numerous crimes on the night of August 16, 1992. Each was convicted of attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3a(1) and (2); first-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5a(1) and 5b(1); attempted possession of a handgun for an unlawful purpose, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:39-4a; attempted unlawful possession of a handgun, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:39-5b; hindering apprehension or prosecution, N.J.S.A. 2C:29-3b(1).
Herrerra also was convicted of third-degree aggravated assault on a police officer, N.J.S.A. 2C:12-1b(5), and speeding, N.J.S.A. 39:4-98. Gonzalez also was charged with third-degree aggravated assault, but was found guilty of the lesser-included offense of simple assault.
Each defendant was sentenced to a twenty-year custodial term with a ten-year parole disqualifier on the attempted murder conviction and a consecutive twenty-year term with a seven-year parole disqualifier on the conviction for possession with intent to distribute. The other convictions either were merged or resulted in concurrent sentences. Each defendant thus received an aggregate term of forty years with a seventeen-year parole disqualifier. We affirmed each defendant's conviction on direct appeal. In a consolidated opinion, we affirmed the denial of each defendant's motion to suppress drugs found in their car, and we affirmed their convictions and sentences on all charges. State v. Gonzalez and State v. Herrerra, No. A-3902-95T4, A-5353-95T4 (App. Div. April 23, 1998). Defendants' petitions for certification were denied. State v. Gonzalez, 156 N.J. 406, 719 A.2d 638 (1998); State v. Herrerra, 156 N.J. 406, 719 A.2d 638 (1998).
Defendants sought discovery as part of their PCR motions. See State v. Ballard, 331 N.J.Super. 529, 559-60, 752 A.2d 735 (App.Div.2000). Defendants, who were tried separately on an eleven-count indictment, moved for PCR in part on the ground that they were erroneously denied "profiling" discovery, including the arresting trooper's stop and arrest records and related requests. On appeal, they claim they were entitled to such discovery on two grounds.
*706 First, they contend that the highway stop, subsequent questioning, and request for Herrerra's consent to search were based upon unlawful profiling and should have been excluded as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). Defendants argue that without discovery, including the trooper's individual records, they were unable to establish the unlawful profile stop that requires suppression of the drugs found in their vehicle. Second, defendants contend that at the trial of all charges,[1] which included assault, attempted murder, and weapons charges arising out of defendants' conduct after the stop, they were deprived of the opportunity to challenge the trooper's credibility on the basis of his alleged motive to cover-up an illegal stop, as well as his alleged history of profile stops.
Given the background of the discovery issue in cases where profiling was alleged, as set forth in detail in State v. Ballard, supra, 331 N.J.Super. at 538-50, 752 A.2d 735, we find no justification for denying these defendants the discovery they sought. The State has conceded that during a period of years from approximately 1990 to 1999, there was evidence of racial and ethnic profiling engaged in by some state troopers on certain highways, including Route 78, where these defendants were stopped in Warren County in August 1992. See Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling (issued by the Office of the Attorney General, April 20, 1999) ("Interim Report")[2]; State v. Soto, 324 N.J.Super. 66, 734 A.2d 350 (Law Div. 1996).
In Soto, Judge Robert Francis found, after a lengthy evidentiary hearing, that statistical evidence established a "prima facie case of selective enforcement which the State has failed to rebut...." Id. at 69, 734 A.2d 350. The evidence produced in that case established that African-American drivers were disproportionately stopped on the New Jersey Turnpike between Exits 1 and 7A, the section where the defendants in that case had been stopped. Ibid. As a result, the Soto defendants' motions to suppress drug evidence were granted. Id. at 85, 734 A.2d 350. Obviously, the existence of such a pattern did not mean that all or even a majority of state troopers engaged in such behavior; nor did it mean that any one trooper routinely engaged in such behavior. But it did lead to the creation of the Review Team, whose Interim Report led us to provide for consistent procedures and a uniform approach to discovery decisions involving claims of profiling by State Police *707 troopers. Ballard, supra, 331 N.J.Super. at 548-51, 752 A.2d 735.
We held in Ballard that the findings published in the Interim Report and in Soto met the threshold, that is, established a colorable claim of selective enforcement (profiling) against members of an identifiable minority who had been subjected to a motor vehicle stop on the New Jersey Turnpike, on Route 78, or on Route 80, during the period between Soto and the Interim Report. Id. at 541-43, 752 A.2d 735. We held that such persons could be entitled to discovery, including statistical reports of state trooper stops in the relevant area and time period, as well as the records of individual troopers involved in the stop. We explained that a colorable claim does not mean that discovery is automatic, but it does establish a prima facie right to discovery and shifts the evidentiary burden to the State to rebut that right. Id. at 540, 752 A.2d 735. In Ballard, we found insufficient rebuttal evidence and therefore ordered discovery in three contested cases. Id. at 542, 752 A.2d 735.
Our decision in Ballard, in turn, led the State to dismiss a substantial number of criminal indictments rather than produce the discovery sought or challenge the allegation of profiling. Ballard followed the Supreme Court's designation of Judge Walter R. Barisonek to hear all cases involving discovery requests based upon allegations of racial profiling.
With that brief background, we turn to the appeals now before us. In our consolidated opinion on defendants' direct appeals, we described the events surrounding the stop:
[O]n August 16, 1992, at approximately 10:00 p.m., State Trooper David Acevedo observed defendant driving a vehicle at a high rate of speed on Route 78 in Warren County. Gonzalez was a passenger in the vehicle. The Trooper's radar unit clocked the vehicle travelling at sixty-eight miles per hour in a fifty-five mile per hour zone.
The Trooper stopped the vehicle and requested defendant's driving credentials. Defendant produced a Missouri driver's license bearing his name with an address in Kansas City. He did not have the registration for the vehicle but did have the title which revealed a different spelling of his name than how it was spelled on his driver's license. Further, the title listed defendant's address at a location in Reading, Pennsylvania.
The Trooper directed defendant to exit the vehicle and asked him where he had come from. He replied that he had come from New York but could not identify a particular part of the State. When he was asked about the passenger in the vehicle, defendant stated that he did not know Gonzalez's last name; he only knew Gonzalez as Nelson.
Based upon these events, the Trooper asked Gonzalez to exit the vehicle. Upon questioning, Gonzalez also did not know where they had come from, other than New York. When asked for identification, Gonzalez displayed a Missouri driver's license with the same address as defendant's, a peculiar circumstance after defendant stated that he did not know Gonzalez's last name.
Based on these discrepancies, the Trooper asked defendant to consent to a search of the vehicle. The Trooper obtained a consent to search form for defendant's signature. Defendant indicated that he did not understand the form and therefore wanted assistance from Gonzalez. At this time, the Trooper had defendant and Gonzalez separated for reasons of safety. He then called Gonzalez to exchange places with defendant so that Gonzalez could review the consent to search form.

*708 As Gonzalez looked at the form, defendant started approaching the Trooper and said he would sign the form. Gonzalez then grabbed the Trooper from behind in a "bear hug." Defendant then charged the Trooper and began to choke him. During the ensuing struggle, Gonzalez attempted to obtain the Trooper's gun while urging defendant to choke the Trooper. At the same time, defendant was urging Gonzalez to "get it," meaning the gun. Although the remarks by defendant and Gonzalez were spoken in Spanish, the Trooper, who is Hispanic, understood them.
Eventually the Trooper was able "to break the grip of Gonzalez who had a hold of [his] weapon and [he] was able to retrieve his weapon from his holster." He pulled out his weapon and "fire[d] two rounds in the direction of defendant and Gonzalez." Defendant was wounded by one of the shots and therefore was unable to move. The Trooper prevented Gonzalez from attempting to flee. Other officers arrived on the scene and arrested defendants. They were transported to the hospital for medical assistance.
Subsequently, a warrant was obtained and a search of the vehicle was conducted. The search revealed more than fourteen ounces of cocaine.
[State v. Gonzalez, supra, slip op. at 6-8.]
On direct appeal, we rejected Herrerra's argument that the trooper "did not have an articulable objective basis to conduct an investigatory stop of defendant's automobile, and therefore his removal of defendant and the passenger ... was a pretext preliminary to an arrest without probable cause." Id., slip op. at 9. We also rejected Gonzalez's arguments that the stop was "a pretext to conduct a search for drugs," and that "the attempt to obtain consent to search the vehicle was a pretext which would not have been valid had it been obtained."[3]Id., slip op. at 10.
These defendants were among the relatively few individuals who claimed to have been victims of profiling in the early 90's, before Soto or the Interim Report, but as to whom the State was unwilling to dismiss the indictment. Persons in that category appear to be those who were charged not only with crimes involving contraband found in the motor vehicle or on the person of the individual(s) stopped  that is, crimes that originated before the challenged motor vehicle stop  but also with crimes committed after the stop, such as resisting arrest, assault on a trooper, and in this case, attempted murder of the trooper. Understandably, those are charges the State was unwilling to dismiss, irrespective of any evidence of a profile stop that might or might not exist. See, e.g., State v. Lee, 381 N.J.Super. 429, 886 A.2d 1066 (App.Div.2005); State v. Ball, 381 N.J.Super. 545, 887 A.2d 174 (App.Div. 2005), both of which involve similar circumstances and issues to those before us.
Judge John H. Pursel, hearing defendants' post-conviction-relief motions, appropriately referred the discovery issue to Judge Barisonek. Issue then was joined *709 on this question: if we assume that discovery would show that unlawful profiling was a factor in the conduct of the stop, does defendants' conduct after the stop create a sufficient break in the chain of events to avoid exclusion of subsequently obtained evidence as fruit-of-the-poisonous-tree? Stated another way, the question is whether defendants' attacks on the trooper were so attenuated from the stop to allow the drugs, seized from defendants' vehicle thereafter, to be admitted into evidence pursuant to State v. Casimono, 250 N.J.Super. 173, 593 A.2d 827 (App.Div. 1991), certif. denied, 127 N.J. 558, 606 A.2d 370 (1992), cert. denied, 504 U.S. 924, 112 S.Ct. 1978, 118 L.Ed.2d 577 (1992). Judge Barisonek reasoned that even if these defendants had been "profiled," and thus subjected to an unlawful stop, their conduct after the stop was sufficiently attenuated from the stop itself to justify admission of the seized evidence for all purposes  the drug charges as well as the crimes against the trooper. As a result, the judge found no reason to allow discovery.
Judge Barisonek gave a detailed explanation for that decision:
In our cases, ... Nelson Gonzalez and Alfonso Herrerra, it is alleged that in fact the discovery of the various drugs is relevant because it may affect the credibility issues as was determined by the trier of the fact in their trials. They also allege if the jury heard that testimony, it may choose to disbelieve the troopers and in fact find that the actions on the part of the troopers were the illegal acts and it had nothing to do with the alleged intervening illegal act as committed by any of the other defendants.
In addition to that it is argued that because of the egregious conduct on the part of the State Police by engaging in acts of racial profiling, that even if there was a subsequent intervening act that occurred, that the constitutional infringements of the defendant's rights as a result of racial profiling is so egregious, the State should be barred from using that particular evidence. Also it should be barred because of the nexus between the stop, the police misconduct, the subsequent arrest and finding of the evidence that incriminates the defendants.

Actually, it is an interesting issue, quite honestly, in terms of the credibility issue because it may have some relevancy to the fact finder's obligation. None of these issues had ever been addressed in any other decision, including all the cases I cited and discussed up until now.
The exclusionary rule generally prohibits the use in criminal proceedings of evidence obtained in violation of federal or state constitutional rights. James v. Illinois, 493 U.S. 307 [110 S.Ct. 648, 107 L.Ed.2d 676] (1990); State v. Johnson, 118 N.J. 639 [573 A.2d 909] (1990). "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or a result of an unlawful invasion." Wong Sun v. United States, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963). However, evidence is not subject to exclusion "simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has [been come at by] exploitation of that illegality or instead by means sufficiently distinguishable to be purged of [the] primary taint." That is under the Wong Sun case at page 488[, 83 S.Ct. 407].

*710 New Jersey has adopted the break-in-chain principle. State v. Casimono previously cited. There are three factors that a court should consider in determining whether the taint of the unlawful police activity is sufficiently attenuated so that the exclusionary rule would not apply. One, temporal proximity between the illegal conduct and the challenged evidence; two, the presence of intervening circumstances and three, the flagrancy and purpose of the police misconduct. State v. Casimono, 250 N.J.Super. 173, 183 [593 A.2d 827], citing State v. Johnson, [118] N.J. 639[, 573 A.2d 909], and Brown v. Illinois, 422 U.S. 590, [603-04, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 427] (1975). [Emphasis added].
Defendants Gonzalez and Herrerra were convicted of attempted murder because they allegedly tried to choke the arresting trooper to death and tried to commandeer his weapon. The issue is whether or not that represents a sufficient break in the chain between the discretionary stop made by the police and their intervening acts. As I already cited under the resisting arrest statute as an example one does not have the authority to resist an illegal act and once an individual defendant takes action against a police officer who is in performance of his duties, whether they be unlawful or illegal, that person subjects himself to a criminal charge of either aggravated assault, resisting arrest or attempted murder.
In our case the search of the defendant's vehicle was conducted after they were legally arrested and after a valid search warrant was issued. The valid search warrant, while it may have relied upon observations made by the officers that supported "the discriminatory stop," obviously it was also based on the alleged illegal acts on the part of the defendants in terms of their response to the police officer's intervention.
That is a little different than the circumstances we discussed in Casimono and under [United States v. Bailey, 691 F.2d 1009 (11th Cir.1982), cert. denied, 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983).] In those cases the police officers were involved in discriminatory acts based on what they observed as part of their discriminatory act.
Now, what makes these cases interesting is the Ballard decision, when they start talking about a discriminatory act and that discriminatory act can either be pre-stop or post-stop and Ballard is very clear about that. Either pre-stop or post-stop. So one question you would ask, as an example, under the cases involving Herrerra and Gonzalez is whether or not there is anything of a discriminatory nature post-stop so as to say there is a nexus between the original [allegedly] discriminatory act of stopping the vehicle and whether that discriminatory act may have continued or renewed itself post-stop. Quite honestly, I don't see that in this particular case. In fact when you start doing the analysis under Casimono and you do the analysis under Bailey and the analysis under [State v.] Battle [, 256 N.J.Super. 268, 606 A.2d 1119 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1992).] and Johnson, the individual acts of these defendants, even if the discriminatory act was egregious on the part of the police because it involved an act of profiling, is so removed and independent of that initial discriminatory act, that they do not meet the three considerations that the court must consider in deciding whether or not it is sufficiently related to the discriminatory act to have it excluded because of the constitutional issue.

*711 You do have the temporal proximity between the illegal conduct, the stop, and the challenged evidence. The challenged evidence in Herrerra and Gonzalez's situation was actually found after their illegal act. That is not to say that the police would not have searched the car anyway. You know what, if the defendants, so to speak, sat on their hands, they would have had appropriate remedies due to racial profiling constitutional violations of the Fourth and Fifth Amendments to have that evidence excluded. They chose, however, not to do that. Their acts are independent I find of the original basis for the stop and the discovery of the item was a result of additional police actions that were not discriminatory in nature post-stop but rather based on what the police officers learned from their further investigations after the intervening acts of the defendants and the need to search that vehicle because of what was going on at the scene. [Emphasis added].
....
So you then get back to the original cases that we talked about in terms of police activities and the nature of the intervening acts under the Casimono decision, under the Bailey decision and under Seymour and start looking at the reasoning of what the Appellate Division said in all those cases. The defendants can't take the law into their own hands. They can't start questioning the legality or illegality of what the police officer is doing and, quite honestly, their response to the police officer has nothing to do with the discriminatory act of stopping the vehicle initially or the consent search. They wanted to get out of there. They commit an intervening criminal act independent of the act, discretionary act, at least sufficiently independent that I'm not going to make a finding today and say that the police incited or attempted to produce this type of result so that they could gain an upper hand. While I agree that an act of racial profiling is egregious, when you look at the previous cases we talked about including Seymour, including Battle, including Bailey and Casimono, I find that in fact this is a sufficient independent act on the part of the defendants which break[s] the chain under Casimono and all of the other cases. When you do the analysis of those three factors, there is a sufficient break in the chain even considering the discriminatory initial stop may be egregious because it involved a Fourth and Fifth Amendment violation based on racial profiling. I find, therefore, that it should be excluded from racial profiling. I have also considered the arguments in terms of the credibility issue.
You are always going to have a credibility issue in any case that comes before a court as it relates to alleged acts of police misconduct. It becomes an issue [because], number one, is that evidence relevant to the proceedings and, number two, under the rules of evidence the weighing of probative value as against undue consumption of time and whether or not there is prejudice involved. This is really not significant evidence as far as I'm concerned in terms of the initial taint, based on the intervening acts of the defendants.
Although we reach a different conclusion on the discovery issue, we appreciate Judge Barisonek's logic: if there is no information responsive to defendants' discovery requests that could have affected the trial and its outcome, then the requested discovery is immaterial. The logic of that approach depends upon whether evidence of a profile stop would materially affect the evidence admissible at trial, with a potential for affecting the verdict. We *712 therefore briefly consider the role of the attenuation doctrine in this case, which in turn leads us to the conclusion that we cannot fairly address the role of that doctrine, if any, until we know precisely what discovery reveals. Discovery therefore must be granted.
By definition and on its face, the doctrine is inconsistent with an absolute or "but for" approach to the exclusionary rule that defendants invoke here. Evidence that is discovered as a result of an illegal search was picturesquely described in Wong Sun as the "fruit of the poisonous tree." In that case, Justice Brennan explicitly eschewed a but-for test: "We need not hold that all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is `whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 487-88, 83 S.Ct. 407 (internal citation omitted); see also Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939) (requiring exclusion because the connection between the lawless conduct of the police and the discovery of the challenged evidence did not "become so attenuated as to dissipate the taint"); State v. Johnson, 118 N.J. 639, 652-53, 573 A.2d 909 (1990) (barring use of the defendant's escape from unlawful detention, for which he had accepted criminal responsibility, as evidence on the very charge for which he had been detained unlawfully). If circumstances intervening between an unlawful search and a subsequent seizure overcome the rationale for the exclusionary rule, then evidence so obtained may not require exclusion as a means of deterring police misconduct.
The Supreme Court recently summarized the fruit-of-the-poisonous-tree doctrine and went on to reaffirm the attenuation exception as set forth in Casimono. State v. Badessa, 185 N.J. 303, 310-12, 885 A.2d 430 (2005). In Badessa, the Court reversed the defendant's conviction under N.J.S.A. 39:4-50.4a for refusing a breathalyzer test. Id., at 315, 885 A.2d 430. The Court held that the police department's failure to give drivers proper notice that they were not permitted to turn off the road approaching the roadblock made it unlawful to stop the defendant for doing so. Id., at 312-15, 885 A.2d 430. While the Court rejected the State's argument (and this Court's holding) in Badessa  that the defendant's refusal to take the breathalyzer test was sufficiently attenuated from the improper roadblock warning  the Court nonetheless distinguished its rejection of the attenuation argument from cases where a defendant who may have been illegally detained or searched attempts to resist arrest or elude the police, the distinction being conduct that threatens public safety and endangers a police officer. Id., at 314-15, 885 A.2d 430 (citing Casimono, 250 N.J.Super. at 182-85, 593 A.2d 827 and Seymour, 289 N.J.Super. at 86-87, 672 A.2d 1273).
Writing for the Court in Badessa, Justice Albin said:
The Appellate Division found that because the exclusionary rule does not apply to resisting arrest or eluding the police following an illegal search or detention, the rule should not apply to a refusal charge. We do not find comparable this refusal case and a case involving the commission of a new crime that directly threatens public safety, such as resisting arrest or eluding the police. See State v. Casimono, 250 N.J.Super. 173, 182-85, 593 A.2d 827 *713 (App.Div.1991) (resisting arrest), certif. denied, 127 N.J. 558, 606 A.2d 370 (1992), cert. denied, 504 U.S. 924, 112 S.Ct. 1978, 118 L.Ed.2d 577 (1992); State v. Seymour, 289 N.J.Super. 80, 86-87, 672 A.2d 1273 (App.Div.1996) (eluding police). Here, the act of refusal in no way endangered the safety of the police officer.
Unlike this case, in State v. Casimono, supra, the defendant's improper detention by the State Police did not warrant the exclusion of evidence of his resisting arrest because the defendant had committed an entirely new crime that placed the officers in physical danger. 250 N.J.Super. at 183-84 [593 A.2d 827]. In Casimono, supra, the defendant's "physical confrontation with the troopers created a high potential for causing injury to the officers," leading the court to conclude that "the need to protect the troopers' safety outweighed whatever marginal deterrent to police misconduct might be provided by immunizing defendant's actions from criminal liability." Id. at 184 [593 A.2d 827]. In those circumstances, the commission of a new crime was an intervening act that marked "the point at which the detrimental consequences of illegal police action [became] so attenuated that the deterrent effect of the exclusionary rule no longer justified its cost." Id. at 185 [593 A.2d 827] (internal quotation marks omitted); see also Seymour, supra, 289 N.J.Super. at 86-87 [672 A.2d 1273] (holding that even if police did not have reasonable and articulable suspicion to stop defendant's vehicle, endangering public by eluding police at high speeds was sufficient intervening act to purge taint of earlier unconstitutional action).
[Id., at 314-15, 885 A.2d 430 (emphasis added).]
We recognize that the Supreme Court has not yet addressed the attenuation doctrine in the context of a profiling stop; we infer nonetheless from Badessa that the doctrine is alive and well. We consider that the threat to public safety and to the safety of all law enforcement officers represented by post-stop conduct, such as that engaged in by these defendants, makes it unwise and unnecessary to exclude evidence from a trial on those crimes  particularly where a warrant was sought and issued before the search that produced the evidence.
It seems to us that there is a significant difference, in the PCR proceedings here, between defendants' potential suppression argument respecting their drug convictions and the argument respecting the attempted murder and related convictions. Our concern for the safety of all law enforcement officers, even those who may have engaged in the offensive practice of racial profiling, requires us to disavow any suggestion that a person who is stopped by police, irrespective of a sincere belief that he or she has been selectively targeted based upon improper factors, has the right to respond with force or resistance.
Even if evidence seized after defendants' arrest and authorized by a search warrant would be admissible on the attempted murder and other charges arising out of defendants' conduct after the stop, application of the exclusionary rule would be less clear with respect to the drug charges. We therefore conclude that defendants are entitled to discovery of this trooper's history and any other relevant information.[4] If such discovery does not support defendants' *714 suspicion that this trooper engaged in unlawful profiling in his conduct of the stop, then the matter is at an end; the attenuation issue would not arise. If, on the other hand, discovery provides credible support for defendants' suspicions about the stop, then Judge Pursel will reconsider defendants' PCR motions in light of that evidence. Until such time, it is premature for us to decide whether the stop is sufficiently attenuated to uphold admission of the challenged evidence with respect to any of defendants' convictions.
Our decision in this case is narrow, applying only to the time period preceding the Interim Report. We should not be understood to hold that members of an identifiable minority group, who have been stopped on a state highway by a law enforcement officer since the 1999 Interim Report, are entitled to similar discovery merely by alleging racial profiling. We emphasize this limitation because the colorable claim of profiling, which we have found here based upon Soto and the Interim Report, cannot be sustained on those findings alone with respect to periods after the Interim Report and official actions responsive thereto.
In so limiting our holding, we take particular note that the Interim Report included eighteen "Specific Action Steps," with this goal:
To enhance public confidence in the New Jersey State Police by ensuring that all motor vehicle stops are conducted in a professional, courteous, and constitutional manner, and by providing assurances that state troopers do not rely to any degree on race, ethnicity, or national origin in selecting vehicles to be stopped or in exercising police discretion at any point during the course of a motor vehicle stop.
[Interim Report at 91.]
Among those eighteen steps were the "Quarterly Publication of State Police Statistics,"[5] "Revised Standard Operating Procedure for Traffic Stops," "Development of Practical Stop Criteria,"[6] and "Procedures Governing Consent Searches."[7]Id. at ii, 94, 96, 98, 100. The installation and use of video cameras on trooper vehicles, to be activated on highway stops, "pursuant to the Governor's and Attorney General's initiative," was acknowledged in the Interim Report as a source of evidence and a "basis for a reliable and trustworthy system to detect problems, to prevent abuses, to protect officers and citizens alike, and to restore full public confidence in the State Police." Id. at 87. We understand that video camera use on State Troopers' highway stops has become routine.
Judge Pursel, hearing defendants' post-conviction relief motions in Warren County, addressed each motion in a detailed, well-reasoned written decision. Apart from the discovery issue explicitly addressed *715 in this opinion, and any argument that may be available to either defendant thereafter based upon what is revealed in discovery, we find insufficient merit in each defendant's remaining arguments to warrant further discussion in this opinion. We therefore affirm the denial of relief on all other grounds, including defendants' respective contentions of ineffective assistance of counsel. See R. 2:11-3(e)(2).
Reversed and remanded to Judge Barisonek in the Law Division for an order granting defendants' discovery requests consistent with Ballard, and thereafter to Judge Pursel to reconsider defendants' post-conviction relief motions solely on issues arising from such discovery, consistent with this opinion.
STERN, P.J.A.D. (concurring).
I join the opinion of the court in holding that defendants are entitled to discovery in support of the claim that they were the victims of racial profiling. I believe the opinion is consistent with State v. Ball, 381 N.J.Super. 545, 558-63, 887 A.2d 174 (App.Div. 2005), which I joined.
Our "racial profiling" jurisprudence permits discovery by minorities stopped by the New Jersey State Police during the period of time when racial profiling was occurring, as identified by State v. Soto, 324 N.J.Super. 66, 734 A.2d 350 (Law Div. 1996), and the Interim Report of the Attorney General. We have not found an analysis of the validity of the stop or search in the particular case to be relevant or a prerequisite to obtaining the discovery. See, e.g., State v. Payton, 342 N.J.Super. 106, 111, 775 A.2d 740 (App.Div. 2001) (holding "that a challenge to the consent to search preserves racial profiling or selective enforcement defenses," and entitlement to discovery, regarding the initial stop, despite defendant's failure to raise profiling as an issue in the trial court); State v. Francis, 341 N.J.Super. 67, 76-77, 775 A.2d 79 (App.Div.2001) (holding on direct appeal that based on Soto and the Attorney General's Interim Report, defendant satisfied the "threshold" necessary for obtaining discovery on whether the stop was discriminatory); State v. Ballard, 331 N.J.Super. 529, 559-60, 752 A.2d 735 (App.Div.2000) (indicating that the purpose of discovery is to shed light on whether the stop itself was discriminatory). See also State v. Clark, 345 N.J.Super. 349, 358-59, 785 A.2d 59 (App.Div. 2001) (granting discovery on petition for post-conviction relief based on claim of racial profiling).
It seems to me that it is prudent to consider the attenuation issue only after it is determined that defendants are the victims of racial profiling, not before. I therefore join the opinion of the court.
NOTES
[1] Herrerra's PCR counsel argued to the discovery judge that although the jury convicted him of the post-stop crimes, he did not have an opportunity to challenge the trooper's credibility on the basis of his allegedly improper conduct in stopping and in seeking consent to search Herrerra's car, because of his Hispanic ethnicity.
[2] Whereas the Interim Report "focused on the subject of racial profiling," The Final Report of the State Police Review Team, issued by the Attorney General's Office on July 2, 1999, "focuse[d] on recommendations concerning the issues of hiring, promotions, internal affairs, and discipline" to meet a need for "significant change" in light of the Team's observations that while "the overwhelming majority of police officers pay undying loyalty to their oaths to uphold the law and to faithfully, impartially, and justly perform their duties," nonetheless, some aspects of State Police performance have "severely undermined its support in significant portions of the State's law-abiding citizenry." Final Report, Overview at 1, 2, available at www.aele.org/NJAG799.html.Interim Report available at http://www.state.nj.us/lps/intm  419.pdf.
[3] Whether or to what extent defendants alleged selective enforcement in their pre-Soto motions to suppress, it is plain that they are entitled to raise the issue and to seek "profiling" discovery on their motions for post-conviction relief. See State v. Francis, 341 N.J.Super. 67, 76-77, 775 A.2d 79 (App.Div. 2001); State v. Payton, 342 N.J.Super. 106, 111, 775 A.2d 740 (App.Div.2001); see also State v. Ross, 335 N.J.Super. 536, 763 A.2d 281 (App.Div.2000), certif. denied, 167 N.J. 637, 772 A.2d 939 (2001); State v. Williamson, 335 N.J.Super. 544, 763 A.2d 285 (App.Div. 2000); State v. Velez, 335 N.J.Super. 552, 763 A.2d 290 (App.Div.2000).
[4] The scope of permitted discovery shall be determined by Judge Barisonek, consistent with Ballard and discovery orders previously entered thereunder.
[5] Statistics were to detail "the proportion of minority and non-minority citizens who were subject to various actions taken by State Police members during the course of traffic stops." Id. at 94.
[6] The stated purpose was to guide troopers in the lawful, safe and effective exercise of discretion and to "clearly and precisely" set forth prohibited factors, "including race, ethnicity and national origin of occupants." Id. at 98-99.
[7] The Interim Report recognized "that minority motorists were disproportionately subject to consent searches, and proposed "a case-by-case review" of such searches on the Turnpike in 1997 and 1998. Id. at 31. Consent searches in the future would be subject to an updated Standard Operating Procedure, with consent sought "only when facts are present that constitute a reasonable, articulable suspicion that the search will uncover evidence of a crime." Id. at 100.